BROGDEN, J., dissents.
The defendant was indicted for the homicide of Alfred Ellison, he was found guilty of murder in the first degree and was sentenced to be electrocuted.
The evidence was to the effect that the deceased was a small man, weighing about 140 pounds, and about 81 years old, and was operating a filling station and small store at McCormick Crossroads in Scotland County. He lived alone in the rear of the store, which was cut off by a partition. Deceased was alleged to have been killed on Friday night, 3 January, 1930. S.H. Dunlap, a rural policeman, and R. C. Miller, a deputy sheriff of the county, went to the store Saturday afternoon about 3:00 o'clock. The building was closed, the windows had blankets hanging over them and from the outside no one could see the conditions on the inside. Officer Dunlap went through a window in the gable. He opened the front door for the other officer, Miller. The back door could not be opened, the other door was locked, there was no key to it. The front door was barred. Ellison was found lying with his head at the corner of the icebox towards the door — feet back towards the stove, and almost on his face, his hand up, and blood was all over everything. In the back of his head the skull was shining; his head was busted with an axe there. The wounds were made with a sharp instrument. The cash drawer was pulled out and there was a dollar bill over behind the till of the cash drawer. There was a trunk there and the lid was up; that had been rifled; the contents of it were tousled up. An axe was found in the store, it was standing on end, between the kerosene barrel and the box, in the same room the deceased was in. The axe had fresh blood on the blade. A hat was found in the icebox, and the icebox was closed. There was blood on the hat, a hole was in the hat, and there were some white hairs on the hat at that time.
Dr. Peter McLean, an expert physician and surgeon, examined the body and found nine wounds on the head, three looked like hits and the others like slight cuts. "They looked to be made with a blunt instrument; the skull was fractured in three places; it was badly beaten up; fractured in two places."
R. C. Miller testified, in part: "I was present at the time the defendant was arrested, so was Mr. Jones, the sheriff and Mr. Dunlap. We arrested the defendant right on the State line. He was in a Ford touring car with Cornell Thomas. We arrested him about eight-thirty and brought him to Laurinburg and put him in jail. I was not present when the jars were turned over to Mr. Jones. He got out of our car and went after them. We found five dollars in a pack of Chesterfield cigarettes on the defendant; five dollars was inside of the cigarettes, back in behind them; five dollars in ones; and we found *Page 151 
some other money on him — he had on wrapped leggings — regulation wrapped army leggins, and we found a ten dollar bill stuck in the end of them where the strap fastens, and I think he had one or two dollars in paper money in his pocket. This is the money we found on the defendant; there is $24.00 there."
R. C. Miller and other witnesses, in the absence of the jury, were examined on the voir dire as to the competency of the confession made by the defendant. On the jury being brought in, the following questions were propounded to the witness: (Examination by solicitor) Q. Now, Mr. Miller, before the defendant had any conversation with you, state to his Honor and the jury whether or not you or anyone in your presence made any threat to the defendant? A. Did not. Q. State to his Honor and the jury, before the defendant had any conversation with you whether or not you or anyone in your presence offered him any reward or hope of reward or told him it would be better for him to make any statement to you? A. No, sir, did not. Q. State to his Honor and the jury whether or not anyone in your presence at any time, before the defendant made any statement to you, by means of any force whatever forced the defendant to make any statement to you? A. We did not. Q. Go ahead and tell his Honor and the jury what, if anything, the defendant told you and the other officers in your presence about his connection with this murder, if any? (Objection by prisoner, exception.) A. He said that he went to Ellison's place and came on down by this one-armed negro's house — Josh Norman — and stayed there about twenty or thirty minutes and came on down to the filling station, Mr. Ellison's filling station, and went in and he bought a coca-cola or a soft drink of some kind, and he picked up the axe and hit the old man in the head and after he hit him he saw a little black bag over there and decided he had just as well take his money and the pistol happened to be in it and he took it home and counted it all except the pennies and nickels — that he didn't count them — and burned up the bag and later burned up the pistol and put the money in this fruit jar and hid it in the woods. He said he burned the pistol the next morning; said it was right between seven-thirty and eight o'clock when he hit the old man in the head. He said the thirty-five dollars was all there was there not counting the silver money. He said he hid the money in the woods and then he stayed at home that night and the next day and the next day and about the middle of the day or after dinner he and his wife came to town — to Laurinburg — and he found out on the streets up here the next day — he stayed over in Laurinburg that night, didn't go home — and he heard on Sunday we were looking for him and he kept dodging around. He said he had a bottle with him and was drinking but he didn't know whether that bottle there was the same *Page 152 
bottle or not but it looked like it. I don't recall that he said where he got what he was drinking. He said he hit the old man once and he fell and looked like he was about to get up and he kind of tapped him again. He said when he left the filling station he went out the door and pulled the door to and turned the key and the key wouldn't come out and he left the key in the door. I didn't ask him anything about the sacks over the windows and doors. I don't remember anything else he said. That conversation was in the presence of the sheriff and Mr. Jones; the sheriff was in and around the jail there."
The entire alleged confession of the prisoner, as testified to by the witness, R. C. Miller, was in apt time, objected to by the prisoner. The objection was overruled and the prisoner excepted. Thereupon the prisoner moved the court to strike out the testimony of the witness, R. C. Miller, as to the entire alleged confession of the prisoner as testified to by said witness. Motion denied and the prisoner excepts.
The testimony of R. C. Miller as to defendant's confession, was corroborated by Sheriff F. C. McCormick and J. T. Jones. J. T. Jones also testified, in part: "I was a rural policeman of this county in January of this year. I found that piece of iron, Mr. Brown and myself found it, under the defendant's house, and at that time it appeared to be freshly burned. Q. Do you know what kind of pistol that was? A. I can't swear but I believe it was a Smith and Wesson. We found it under the front porch, not very far from the chimney; the chimney was in the middle of the house."
Cornell Thomas testified, in part, to the effect that defendant came to his house about quarter to three in the morning, the following Thursday after the killing. "I asked did they have him accused of killing this man at the filling station and he said `No,' and we talked on a little more. He asked me did I have any cigarettes and I told him `No,' and he said he wished he had a cigarette and we sat there and I asked him wasn't he hungry and he said `Well, he could eat,' and I told my wife to get up and give him something to eat and she gave him something to eat and he said he wished he had some money and we kept talking on — me and him — concerning money — and he asked me would I go to his house and tell his wife to send him some money, and I asked him how much money did he have that he could get, and he said about fifteen dollars, and I finally told him fifteen dollars wouldn't carry him anywhere and he needed more than that if he had it, and he told me to tell them to send him thirty-five dollars. . . . I found some money about five or six hundred yards from the house; it was in a little streak of woods about where an old stump was — looked like it had been dug up and a little sink there and it was buried. I found that little jar there with that money in it. That knife was not *Page 153 
in the jar when I found it — thirty-five dollars in greenbacks. I can't tell you exactly what denominations it was in — some one dollar bills and five dollar bills and some ten; I can't tell you exactly what shape; I didn't pay that much attention. After I found the jar I left the money in it and gave him the greenbacks; I didn't find any more money anywhere else and he was still at my house when I got back; he said he didn't know where to go. I carried the jar to an old house where we used to live and hid it in some corn and later I told Mr. Jones (the rural policeman) where it was and told him I found it and where I found it and went to the house with him. . . . I guess he was arrested about eight-thirty that same night; I was with him when he was arrested and I was taking him to the State line. . . . I asked him where he had been working since he quit over here and he told me on people's cars about the country. I hadn't seen Dave since the time the man was found dead until he come to my house; the last time I saw him was in the fall. He nor his wife are any kin to me. (Cross-examination.) Yes, sir, when he come to my house and told me who he was I opened the door and he come in and we sat down by the fire and built it up after a while — after my wife give him something to eat, and we talked and I asked if the officers were not hunting him and he said he didn't know anything about the killing; denied knowing a thing about it and said he didn't have anything to do with it. Yes, sir, he stayed there after I told him the officers were hunting him — he was scared; my wife give him something to eat and I told him I couldn't do him any good. I didn't tell him if I was him I would get away while the getting was good; I told him the way it looked to me he was burned up and I couldn't do him any good and then he said he wished he had some money; I didn't tell him I didn't have any money. He told me to go see his wife and get some money. . . . Dave didn't know we were going to meet the officers I didn't tell him where I was going to take him. I told him I was going to carry him across the State line."
It was in evidence that Cornell Thomas obtained the information where the money was his from defendant's wife, who went with him and pointed out the spot where Thomas found it.
Leon McCormick testified, in part: "I am about 13 years old. On Friday night before Mr. Ellison was found dead on Saturday, I passed the filling station about 7 o'clock and there was nobody there then but Mr. Ellison. I went in and got a package of chewing gum and came right out and went to my cousin's — Huntley Webb's — about a quarter of a mile from Mr. Ellison's and came back by the filling station about eight-thirty — I stayed at my cousin's about an hour and a half — and I didn't stop as I came back by the filling station. It was dark and I *Page 154 
couldn't see anybody or any light in there. I was walking and in the middle of the road; the road went right by the filling station. There was a light in the filling station when I went by the first time, a lamp."
Josh Norman testified, in part: "I saw the defendant Dave McRae that night; he was at my house when I come from work; I come in about 7:30; it wasn't dark when I come in, it was just sundown, and he was there then and stayed about thirty minutes. . . . I smelled a little mule on him at that time; that is something to put in automobiles — alcohol. I told him I was too tired to go anywhere and he said he was going to step down to Son McRae's — he stayed right below me, in the direction of the filling station, about half the distance from my house to the filling station. I didn't see him any more that night. When he left my house he asked me what time it was and I told him it was seven-thirty; that is when he left; I looked at my watch. He left my house alone."
Albert Hunt testified, in part: "I saw Dave McRae, the defendant, on Friday afternoon before Mr. Ellison's body was found on Saturday; he was just in front of Mr. Ellison's filling station. I was working on the ditch bank and Dave came by where we were working. . . . When he turned around he had a bottle in his pocket but he didn't take it out. It was a pint bottle with a small neck and a brown looking stopper and resembled this bottle. I couldn't see what was in the bottle. This bottle was found in the filling station at the kerosene tank, right by the axe; the axe was sitting up and the bottle sitting right on top of it. I went in the window of the filling station with Mr. Dunlap before the door was open to let Mr. Miller in and this was in the bottom of the bottle when I found it; that is whiskey was in there. Dave McRae was living down at Gum Swamp at this time, about a mile or three-quarters from the filling station. . . . Q. Just state whether this defendant ever made any statement about Mr. Ellison of any sort? A. Yes, sir, one time, me and Dave McRae helped Mr. Norton kill hogs and come to Mr. Ellison's filling station in the evening when we got through and me and Dave went in and he had a fire in the heater and sat down — I sat down and Dave stood up, and the old man was behind the counter fixing his supper and Dave bought a loaf of light-bread and a can of sardines, and said `Mr. Ellison, give me your can cutter,' and he did it and when he handed it to Dave he says, `Dave, I want this one back,' and Dave says `You will get it back,' and he cut the sardines and give it back to him, and Dave come and sat down on the opposite side of the heater from me and Dave asked me did I want a piece of light-bread and he gave me a piece and I says `Dave, what was that about a can cutter, what was the matter with you and the old man?' and he said the old man accused him of stealing a can cutter Sunday *Page 155 
and he never stole it, and I says `You and the old man are going to keep on until you have trouble,' and Dave says `I will kill hell out of that old man,' and I says `That old man will kill you, he will shoot you because he has got a pistol' — they told me he bought a pistol — and Dave says `I will kill hell out of him and take that pistol,' the old man was sitting behind the counter eating supper and I went on home and left Dave there and Son Revels come in. I think it was Monday after Christmas."
The evidence relative to the testimony on the voir dire will not be set forth, but briefly stated in the opinion.
The defendant introduced no testimony, made assignments of error to exceptions above taken, as to the defendant's confession, and other exceptions and assignments of error, and appealed to the Supreme Court.
The only material assignment of error is to whether the confession of defendant was voluntary. This was thoroughly gone into on the voir dire by the judge below in the absence of the jury, and the court ruled that it was voluntary. There was evidence to support this ruling and the witnesses, after proper preliminary questions, who heard the confession of defendant, were permitted to testify. In this we can see no error.
In S. v. Fox, 197 N.C. at pp. 487-8, we find: "This Court, throughDillard, J., speaking to the subject in S. v. Sanders, 84 N.C. at p. 730, said: `Under the objection made, the admissibility of the confession depended on the facts accompanying it and the legal inference therefrom, the facts being matter for the decision of the judge and conclusive, and the sufficiency or insufficiency thereof to warrant the admission or exclusion of the evidence being matter of law reviewable in this Court. S.v. Andrew, Phil. (61 N.C.), 205; S. v. Whitfield, 70 N.C. 356. If from the facts the legal inference be that the confession was voluntary, then the evidence was receivable, otherwise, not.'. . . When objection is made, the competency or incompetency must be heard on the voir dire. `Voir dire
— to speak the truth. This phrase denotes the preliminary examination which the court may make of one presented as a witness or juror, where his competency, interest, etc., is objected to.' Black's Law Dic., 1212." S. v.Blake, 198 N.C. 547.
In S. v. Moore, 2 N.C. at p. 484: "A confession extorted and uncorroborated by circumstances, weighs nothing; but a confession whether extorted or not, that relates a number of circumstances which the *Page 156 
prisoner could not well be acquainted with but as perpetrator of the crime, all which circumstances are proved by other testimony, to have actually existed, is such testimony as should be left to the consideration of a jury. That is the nature of the confession in the present case; and upon such testimony, if the jury are satisfied with its truth and sufficiency, they may find the prisoner guilty. They should be very cautious however, and examine every circumstance with the most critical nicety before they do so. The jury found him guilty, and he had judgment of death." S. v.Herring, post, 306.
The confession, itself, was full and complete as to the actual killing; the motive of the killing; the obtaining of the money. The confession was corroborated as to the hiding of the money and its location, the larger portion of it being buried near the house of the defendant. The axe was found in the store, with which the old man was killed; the time defendant was seen near the store; the bottle of liquor seen in defendant's pocket the evening before, and a similar one found in the store; the burning and hiding of the pistol, and the similarity to one sold the old man, and many other corroborating circumstances which defendant would not have known of unless he was the perpetrator of the crime.
On the voir dire it was shown that there were no promises or threats made to the defendant that induced this confession. His wife had told the officers where to find the pistol and that the money that Cornell Thomas had given to the officers was part of the money that her husband had hidden. He (defendant) then said to bring his wife up and let her tell it before him. When his wife came in to defendant's presence in the jail, she was told, "Now Dave wants to talk to you about this matter. Go ahead and tell me what you know about it, if you want to." She started crying and started telling what she had told the officers before and Dave stood there a little and tears commenced running down, and he said "You can take her back." After that, Dave did tell the officers the particulars of the slaying. The conduct of the officers in this case was far short of that discussed in Ziang Sung Wan v. U.S., 266 U.S. 1, and which was condemned in that case. There was certainly, in the instant case, no inducement or threat offered the defendant. There was questioning. The whole matter was heard patiently and carefully by his Honor in the court below, and is spread upon the record here. It is evident, of course, that the discovery by him that his wife had told the officers what he told her induced him to make a clean breast of the whole matter himself. This, however, was not his wife testifying against him. S. v. Graham, 194 N.C. 459; S. v. Burno,post, 267. *Page 157 
The confession of defendant is corroborated in every particular. The murder was more than ordinarily brutal. An old man living alone, harmless and inoffensive, working for his daily bread, at the advanced age of 81, slain in his home at night and robbed. The defendant lived in Gum Swamp, and his cruel and ruthless conduct stamps him as a product of the jungle. The defendant being tried for his life, was given every right and benefit known to the law. Unusually able lawyers were appointed to defend him. They did everything to see that the defendant had a fair and impartial trial. They appealed to this Court, and presented an able argument in behalf of the defendant. The Court's charge went into every phase of the evidence and applied the law applicable to the facts, and the contentions of defendant were fully given. It is to the credit of our Anglo-Saxon civilization that, under such trying circumstances, orderly procedure was followed, and defendant was given a fair and impartial trial. The record discloses that defendant had every right which anyone, high or low, was entitled to under the law. Orderly government is fundamental and should ever be followed, as in the present case, and the people of Scotland County are to be commended. We find in law
No error.
BROGDEN, J., dissents.