ANGIE MICHAEL CAINGETTI, alias A. M. PHILLIPS, v. STATE OF FLORIDA.

2 So. (2nd) 368
En Banc
Opinion Filed May 20, 1941

*William W. Judge* and *H. B. Hodgden,* for Appellant;

*J. Tom Watson,* Attorney General, and *Nathan Cockrell,* Assistant Attorney General, for Appellee.

CHAPMAN, J.—On April 12, 1940, Angie Michael Caingetti, alias A. M. Phillips, was indicted by a grand jury of Volusia County, Florida, for the unlawful killing of Anna K. Henson on the 18th day of January, 1940, by striking her on the head and body with a hammer, thereby inflicting certain wounds causing her said death. He was duly arraigned and entered a plea of not guilty. The appellant was without funds and the trial court adjudged him insolvent and immediately appointed Attorney W. W. Judge, of the Volusia County Bar to defend said prosecution; and subsequent to the order of appointment of Attorney Judge, Attorney H. B. Hodgden was likewise appointed to

assist in appellant's defense. The defendant below was placed upon trial and convicted by a jury of the crime of murder in the first degree, without recommendation to the mercy of the court; and a motion for a new trial was made and denied and the defendant below was sentenced to death by electrocution. From the said judgment an appeal has been perfected to this Court.

Counsel for the appellant in their brief pose six questions for a decision by the Court on this appeal. We have concluded, after reading the record and briefs and examining the authorities cited, that an answer by this Court to the single question, viz.: Did the lower court err in its ruling in admitting into evidence to be considered by the jury the two alleged confessions of the appellant dated March 15 and 16, 1940, made while a prisoner at the county jail in Orlando over the objection and protest of counsel for defendant below? will dispose of the several questions here propounded.

The record shows that the defendant, after the State rested its case, took the stand and testified in his own behalf. In his testimony he admitted the killing of Mrs. Henson in her home where he was living around 4:00 o'clock A. M., January 18, 1940. His testimony is in detail and covers every event of the tragedy. Some of the material parts of the defendant's testimony are, viz.:

". . . About four o'clock I was awakened, I was struck on the back, I didn't know what struck me at the time, and I said 'cut it out,' then the next thing I know I was struck again. I said 'what's the idea.' She said 'I'm going to kill you' and I said 'you are not going to kill me' and I raised up on the left side of the bed close to

the wall, only about 8 or 10 inches to the wall, and jumped across the bed to the right side of the bed where she was standing. As I looked she had a shoe in one hand and in the other hand a hammer. I grabbed her hand with the hammer, and as I grabbed her hand with the hammer she hit me with the shoe. As she was hitting me with the shoe I took the hammer from her and she went for my throat, and while she had hold of my throat there was only one thing to do and I hit her in the head with the hammer, and as I hit her she went back on the bed and I hit her four more times more, that's my recollection. So right after that I was scared, I was scared, I didn't know what to do. I had never committed any crime before of any kind. I had always worked very hard for a living and come from a good family, and I just straightened her out on the bed, covered her with a sheet right in the room, and then I lit a cigar and laid across the bed, but didn't sleep all night and about 7:30 or 8:00 o'clock I couldn't sleep, went in the bath room, and then went down and made a cup of coffee. I didn't feel like eating anything. I was scared. I still didn't know what to do, I didn't know anything about crime, so then I went out. . . .

"So around four o'clock I went upstairs, wrapped the body up with the sheets on the bed and a quilt on top of the mattress and went to the garage and got an old canvas and from an awning at one time was on the sun porch, and I wrapped it around that and put a newspaper around it. I had to wire one arm, I think the left arm, as it was stiff and wouldn't stay over so I had to tie that with wire. I guess you noticed that in the photograph. I had to wire the hands to keep it in place, mostly old wire, electric wire or telephone

wire laying in the garage. About 4:30 I went out and found a couple of shovels in the garage and I dug this hole.

"Q. Four-thirty in the afternoon?

"A. Yes, this was on the 19th of January, 1940. And I got through digging the hole and then I went back in the house, washed myself, cleaned up, and then around quarter to six, I have a grill an electric grill, and I made a couple of toasted cheese sandwiches, cup of coffee and fruit salad, and also a salad of lettuce and tomatoes for myself. About 6:20 I went upstairs, the body was on the floor all wrapped up and I dragged it out, slid it down the stairs, through the sitting room, through the dining room, and through the back bedroom. Then I wanted to make sure, I was still scared at the time, and I wanted to make sure nobody could see me in the back bedroom and there was a clothes rack which stands about five feet eight or five feet ten, taller than I am, and I put my white hat on it, and put it up by the screen door, and I walked out smoking a cigar all along the side of the garage and San Juan, all corners and I looked over and couldn't notice this thing on account of the bushes, and I went back to the house, put the rack back in the bedroom, got the screen door open and dragged the body out head first and slid it right out to the hole and covered it with the bushes, and that night I put the body in, only half covered the hole, and the next morning about 7:30 I got up. I get up each morning about 7:00, and remember hearing the train whistle, and it was a little after 7:30 when I filled in the rest of the hole and covered it up and after that started cutting down the flowers and bushes, and which almost everyone were killed with the frost."

On March 8, 1940, the appellant was arrested and placed in jail at Daytona Beach. He was during the night by the sheriff of Volusia County and deputies driven to Miami, and reached there around 2:00 A. M., and placed in the Dade County jail. He was taken to the sheriff's office and questioned about the death of Mrs. Henson. He gave to the officers a signed statement and this statement is in the record. The sheriff of Volusia County took the appellant from Miami around the Tamiami Trail to Orlando and there placed him in the Orange County jail. An effort was being made during this period to locate the body of Mrs. Henson.

Honorable Murray Sams, State Attorney, went from DeLand to Orlando and contacted him at the Orange County jail and asked him for a statement concerning the death and disappearance of Mrs. Henson, and the appellant made two confessions in writing under oath, which were dated March 15th and 16th, 1940. These confessions were offered by the State and were received in evidence during the progress of the trial, over the objections and protests of counsel for appellant, and it is insisted here that the admission into evidence of these confessions constituted reversible error; and that the same were not constitutionally obtained and fall within the ruling of the Supreme Court of the United States in Chambers v. State of Florida, 309 U. S. 227, 60 Sup. Ct. 472, 84 L. Ed. 419, and other authorities cited.

The record has been carefully examined in the light of the objections of counsel for appellant. It is true that the appellant was in custody and was incarcerated in the Orange County jail when the confessions were obtained. It was necessary for a reporter to

go from Titusville to Orlando and take in shorthand the statements of the appellant and then transcribe the same and return to the jail and the writing as made by the reporter read, corrected, approved and signed. When the case was on trial and the contention of counsel made known to the court that the two confessions were unlawfully obtained, the trial court excused the jury and in its absence heard testimony to determine the question of whether or not the confessions were voluntarily made. The record shows that every witness connected with the transaction appeared and gave testimony before the court in the absence of the jury. All of this testimony has been carefully reviewed and in addition thereto the testimony of the appellant bearing on this point, and we fail to find disputes or conflicts in the evidence between the witnesses for the State and the appellant on the voluntariness of these two confessions. The appellant in his testimony states that they were made voluntarily, without fear, hope of reward, or promise of escaping punishment, although it is true that he stated that the confession made while a prisoner in the Miami jail was unlawfully obtained as he was under some fear or apprehension from the abuse inflicted at Miami when the confessions were made at Orlando.

The lower court conscientiously considered the same and concluded, after all the testimony was submitted by the respective parties, that the confessions dated March 15th and 16th, 1940, at the Orange County jail were lawfully obtained. The confession made by appellant while a prisoner at Miami was not admitted into evidence. The testimony of the appellant given

as a witness in his own behalf is in harmony with a very great deal appearing in the confessions made in Orlando and over the appellant's signature. There is no testimony in the record to support any conclusion other than that made by the lower court. The law is well established on this point and the learned judge below correctly applied the law to the facts adduced.

The confessions were voluntarily made.

This Court had the same question before it in Williams v. State, 143 Fla. 826, 197 So. 562, when it in part said:

"The fact that the defendant was taken into custody on suspicion and questioned by the Sheriff of Alachua County, and his deputies or assistants, is not a sufficient legal cause to exclude either of the written confessions. If the confession emanates freely and voluntarily and is made without fear, hope of reward and promise of escaping punishment, or some other illegal influence, the same is properly admitted. See Clay v. State, 143 Fla. 204, 196 So. 462; Smith v. State, 135 Fla. 835, 186 So. 203; Cawthon v. State, 118 Fla. 394, 159 So. 366; Dabney v. State 119 Fla. 341, 161 So. 380; Harrison v. State, 110 Fla. 420, 148 So. 882; Nickels v. State, 90 Fla. 659, 106 So. 479; Green v. State, 40 Fla. 191, 23 So. 851; McNish v. State, 47 Fla. 69, 36 So. 176; Sims v. State, 59 Fla. 38, 52 So. 198; Williams v. State, 48 Fla. 65, 37 So. 521; Moore v. State, 68 Fla. 91, 66 So. 431; McDonald v. State, 70 Fla. 250, 70 So. 24; Davis v. State, 90 Fla. 317, 105 So. 843; Chambers v. State, 60 Sup. Ct. 472, 84 L. Ed. 419; Bram v. United States, 168 U. S. 532, 18 S. Ct. 183, 42 L. Ed. 568; Ziang Sung Wan v. United States, 266 U. S. 1, 45 S. Ct. 1, 69 L. Ed. 131."

148

The record in this case discloses the commission of an atrocious and indefensible crime. There is not an act, word or deed appearing in all the testimony offered in defense of or for its justification. The callousness as depicted is unparalleled in the criminology of Florida. The hammer used by the appellant in inflicting the blows on the head to crush the skull of Mrs. Henson around 4:00 o'clock in the morning in her own home; his calmly washing the blood from the hammer, then the covering the body with a sheet and immediately lighting a cigar and resting on his bed as he enjoyed his smoke, coupled with his deliberation and the preparation of the body for a secret burial and the wiring of an arm to the body and remaining around the body for some forty-eight hours and then burying it on the premises, are some of the obstinate facts with which the court-appointed counsel were required to defend against. We think counsel performed well their duty but we find no error in the record and accordingly the judgment appealed from is hereby affirmed.

BROWN, C. J., WHITFIELD, TERRELL, BUFORD and ADAMS, J. J., concur.

THOMAS, J., not participating.