23  247
82t 119

## No. 2264.

### RUFUS W. LEDBETTER v. THE STATE.

1. DYING DECLARATIONS—PREDICATE.—As a predicate for the introduction in evidence of a dying declaration, the State must prove, first, that the deceased, when he made it, was conscious of approaching death, and believed there was no hope of his recovery; second, that the declaration was voluntarily made, and not through the persuasion of any person; third, that it was not made in answer to interrogatories calculated to lead deceased to make any particular statement; and, fourth, that the deceased was of sane mind at the time of making the declaration. See the opinion of the court for a predicate *held* insufficient to prove the first of the above requisites; wherefore the dying declaration was erroneously admitted.
2. ARREST.—A peace officer has no authority, beyond the limits of his county, to arrest a party accused of crime.
3. WARRANT OF ARREST issued by a justice of the peace is wholly without authority in a different county, unless it be indorsed by a Judge of the Supreme Court, Court of Appeals, district or county courts (when it may be executed anywhere in the State), or by a magistrate of the county in which the accused is found, when it may be executed in the latter county. If so indorsed, the warrant must be executed by an officer of the county in which the accused is found.
4. HOMICIDE TO PREVENT ILLEGAL ARREST amounts, as a general rule, to no higher offense than manslaughter.

APPEAL from the District Court of Falls. Tried below before the Hon. Eugene Williams.

This was a conviction in the first degree, with the death penalty attached, for the murder of D. P. Rice, in Falls county, Texas, on the fifth day of August, 1886.

Doctor J. M. Witt was the first witness for the State. He testified, in substance, that on the morning of August 5, 1886, he was summoned to attend D. P. Rice, whom he found lying in

the shade of a wagon, about a mile and a half south of Eddy, in Falls county, Texas. He was lying on his chest, with one arm under him. The ground indicated that he had been removed a short distance from the point at which he received his wound. The wound—a very dangerous and, as it proved, a fatal one— was made by a large ball, of at least fifty-six calibre, passing through the arm and into the right side, about one and a half inches to the right of the nipple. Rice recognized the witness at once, and asked what witness thought of his wound. Witness replied that he thought it a very serious wound. Rice then asked that his mother and family be sent for. A young man undertook to unbutton Rice's coat, when witness told him to rip it off. Rice said: "Yes, cut it off; I don't suppose I will have any more use for it." Witness then asked Rice who shot him, and he replied: "An old man named Ledbetter." Witness then asked: "How did it come that you, an officer, let him shoot you?" He replied that, having no idea that Ledbetter would resist him, he went to Ledbetter, who was at his plow, and began to read some papers to him, when he observed that Ledbetter, who was on the opposite side of the plow, was loading his gun; that he then started around the plow to Ledbetter, when Ledbetter shot him; that his own pistol at that time was in his saddle bags, on his horse, about ten steps distant. Rice died of the wound on the evening of August 6, about nine o'clock. The cross examination of this witness disclosed nothing of importance beyond what he testified to on his examination in chief.

Frank Gaines, the brother in-law of the deceased, testified, for the State, that he saw the deceased about dark after he was shot, on the evening of August 5, 1886. Deceased was then very much exhausted and died on the next evening. Deceased told witness that he left his pistol in his saddle bags and went, unarmed, to arrest the defendant, because he thought he could effect the arrest without trouble or resistance. Defendant ordered him to go away, and while he was remonstrating with defendant for resisting arrest, defendant raised his gun; that he, deceased, struck at the gun to knock it up, but missed it, and was shot; that he then caught the gun, wrenched it from Ledbetter, handed it to Norris, and fainted. Deceased rarely ever went armed.

Cross examined, the witness stated that deceased said nothing to him about reading papers to defendant at the time of the shooting. The witness knew of the deceased seizing some of

Ledbetter's oxen under a writ of attachment. In a conversation not long before the killing, about some threats Ledbetter was reported to have uttered against deceased, the deceased said that he had nothing against Ledbetter. Witness would like to see the extreme penalty of the law executed upon defendant, because he believed defendant deserved it.

John W. Norris testified, for the State, that he, with the deceased, Mr. Holbrook and Mr. Boyd, went to find the defendant on the morning of August 5, 1886. They saw him plowing in the open prairie, about half a mile from his ranch house. He was sitting on the grass behind his plow when the party approached. Holbrook and Boyd remained some distance off, and witness and deceased approached the defendant. Witness stopped about twenty-five yards distant from the plow, and deceased rode up to the plow and hitched his horse to the beam. Defendant got up and asked deceased what in the hell he wanted there. Deceased replied that he wanted to have a private talk with him about matters pending between him and the witness. Defendant replied: "You go away from here and let me alone; if you don't I will kill you; I haven't much use for you, anyway; you swore a lie on me once." Defendant got his gun from the plow. When defendant said: "Go away, I will kill you," deceased replied: "No, I guess not; I don't want to harm you; I want to make some arrangement between you and Norris (witness) about the oxen." Defendant replied: "Go away and let me alone; you are all d—d rascals anyway." The shooting quickly followed. Deceased made no effort to get the gun until after he was shot. He then caught the gun, wrenched it from defendant, and he and defendant fell to the ground. As witness ran up the defendant was backing off and the deceased rising to his feet. Witness carried deceased to a pile of hay about ten steps off, and laid him down, and then got the gun from the place where deceased dropped it. About that time the witness looked up and saw defendant rushing forward with an open knife in his hand. Witness told him to go off and let them take care of the man he had killed. He replied that he intended to kill every d—d one of the party if they did not leave the field, and ordered witness to throw down the gun, which the witness did. Witness then rode off, and when he got off about forty yards defendant shot at him. The weapon was a needle gun. Deceased was the only one of witness's party who was armed, and his pistol, at the time of the shooting, was in the saddle bags

on his horse, about ten steps off. No one spoke to the defendant but the deceased.

Cross examined, the witness said that he had never entertained other than kindly feelings for the defendant. He struck witness with his gun on the day before the difficulty, but it was not the witness's disposition to bear malice. Witness did not provoke defendant to strike the blow by calling him a d—d thief and a d—d lying son-of-a-b—h, and ordering him off the place. He merely encountered defendant in the road and asked him to stop and have a settlement, and defendant struck him with his gun. Defendant at one time worked for witness, and in May came to witness's house and got all of his things except a plow and a yoke of oxen upon which witness had a mortgage, and refused to permit him to take away. Defendant claimed to have paid off the mortgage, and witness claimed and knew to the contrary. Defendant got mad on that occasion, but witness did not. Witness admitted that he seized an iron coulter and told defendant he would strike him if he came on with the rock he then had in his hand. Witness did not call defendant bad names on that occasion and order him to leave, with the threat that if he ever came back he would not leave a greasy spot of him. Witness supposed that the paper deceased attempted to serve on the day of the difficulty was a warrant of arrest for striking witness on the day before. Defendant took the oxen from the east part of witness's field while witness was on the west part. This occurred on the day before the killing of deceased. Boyd and Holbrook did not go with deceased and witness to aid in the arrest of defendant, but to bring back the oxen.

On redirect examination the witness said that he did not see the defendant from the time he came, in May, to witness's house and got his things, until the day before the killing of deceased, when he came and took possession of the plow and oxen, on which witness held the mortgage. Witness followed defendant to reclaim the oxen and plow, and defendant, in response to witness's call to stop, struck him with the gun. Witness then swore out a warrant against defendant, and was deputized to serve it. He called on deceased to serve the writ, and took Holbrook and Boyd along to take the oxen back home.

G. I. Carney testified, for the State, in substance that he lived at the house known as the Stone ranch, near the line of Bell and Falls counties. Defendant had been living with witness several days when the shooting of Rice occurred. On the day before

the killing he brought to witness's house a yoke of oxen, and also a plow, to which was attached a needle gun. He made some threats on the morning of the shooting, but witness did not understand who he threatened. When he left on that morning to go to the field, he told the witness that he expected some people and officers to come to the house looking for him, on account of a difficulty of the day before, and directed witness, in the event the officers should come, to warn them not to seek him in the field, and that if they bothered him he would kill them. He said something about "Rice," and witness asked him if he meant Rice from Moody. He replied: "No, I mean that d—d Rice from Morfit" (deceased).

James Pettigrew testified, for the State, that, some time before the killing, and about ten days after the trial of a case in Squire Like's court, to which the defendant was a party, defendant asked witness "where that d—d Rice" could be found. He said that he intended to kill Rice, and Like too, and would not be satisfied until he had killed both. Witness and defendant met on the road, and no one else was present at this conversation.

C. S. Pettigrew testified, for the State, that during the time deceased had defendant's oxen under attachment at the suit of Mr. Fields, he heard defendant say that he intended to kill Rice (deceased), if he ever crossed his path. Defendant was spending the night at the witness's house when he made the threat testified to, and no one else was present. Three other witnesses testified to the fact that, prior to the killing of Rice, the defendant declared that if he was bothered by Rice again he would kill him.

Doctor W. H. Like testified, for the State, that he lived in Morfit, Bell county, Texas, and was the justice of the peace of that precinct. Deceased was the constable of the precinct. The second or third time that the witness ever saw the defendant he came to witness's office and asked where his oxen were, and where he could find the man (prefixing a foul adjective), who took them. The oxen had been recently seized under an attachment. On the fourth day of August, 1886, the day before the homicide, Mr. John Norris filed a complaint against defendant for assault and battery, and, the constable being then absent, witness deputized Norris to execute it.

The State closed.

B. F. Fennell was the first witness for the defense. He testified in substance, that he was on a wagon loading hay, about one hun-

dred and twenty yards distant from the scene of the shooting when it occurred. Defendant had been plowing, and was stooping down fixing a plow point when he was approached by four men. Two of the men stopped some distance from the plow. Norris went with deceased to within fifteen or twenty steps of the plow, and stopped. About that time the defendant saw the parties and got up with his gun in his hands. Mr. Rice rode up to the plow and hitched his horse to the beam. He appeared then to enter into conversation with defendant. He had some papers in his hands, but did not read them. Defendant was holding his gun with the muzzle a little raised, and the stock in his left hand. Within a minute or two deceased passed around the plow towards defendant. He stopped short of defendant for a short space of time, and then made a grab at the gun. He caught the gun by the muzzle, it was discharged, and the two fell, apparently struggling for the gun. Deceased wrenched the gun from defendant, who got up running. He ran off about thirty or forty yards and then returned and made Mr. Norris surrender the gun. After the shooting defendant came to witness's hay wagon and asked witness if he saw the shooting. Witness made no reply. He then said that he regretted having to kill that young man, who was related to some of his best friends, but would have been well satisfied if he had killed Norris instead. He then went to the hay camp. Witness did not see him leave the hay camp, but when the people turned out to hunt him he could not be found.

Cross examined, witness said that he had two men at the wagon helping him when the shooting occurred. Defendant had been plowing east and west, and was running east when the deceased, Norris and the other two men appeared on the scene. They came from the west. Defendant got up from the ground at the plow point before deceased got his horse hitched to the plow beam. He got up with his gun in his hands, holding the muzzle a little elevated, and pointing towards the deceased. Witness saw no weapons in the possession of either deceased, Norris or their companions. Norris dismounted about the time the gun fired, ran to where deceased and defendant were struggling, and caught deceased's hand and pulled him to his feet. Defendant got up and ran about off about forty yards. He then came back with an open knife and made Norris throw down the gun. Norris threw the gun about eight feet from him, mounted his horse and rode off at a "lively" pace. Defendant loaded

the gun at once and fired at Norris when the latter got off about forty yards.

L. H. Boswell testified, for the defense, that he was with the witness Fennell at the hay wagon at the time the killing occurred. The defendant had stopped his sulkey plow at the time that the witness first observed the deceased and his three companions going towards him. Two of the men stopped some distance off from the plow; Norris stopped twenty-five or thirty yards off, and deceased rode up to the plow and rested his arm on the plow, and, apparently engaged defendant in a brief conversation. The defendant at that time held his gun with the muzzle elevated and the stock held in his left hand. Presently the defendant stepped back and deceased stepped to the position vacated by defendant. Defendant then held his gun at full arm's length. Deceased sprang forward, seized the muzzle of the gun, and it was discharged. A negro named Frank was the only other party with witness and Fennell on that morning. Defendant acted strangely during the morning before the difficulty. His oxen had gone off, and he appeared to suspect somebody in the field of having driven them off. He asked every man in the field about them and would believe nothing they told him in reply. When told that they went off in a certain direction, he would not look for them in that direction.

Cross examined, the witness said that the first thing the defendant did when he caught sight of the deceased and his party was to seize his gun. Witness heard defendant tell Mr. Carney on that morning, that if the officers or any body else came after him, to tell them not to go the field, and that he would kill them if they did. Witness heard defendant tell deceased, when the latter first approached the plow, to go away and let him alone, or he would kill him, deceased.

Ioto Baird testified, for the defense, substantially as did the witness Fennell, except that he heard defendant tell deceased he would kill him if he did not go off. This witness was not with Fennell, but was at a hay rake, a few feet nearer the scene of the killing than Fennell and his party were. Defendant said nothing to this witness after the killing. He came to witness before the men came on the ground, and asked about his oxen, and appeared to think witness had driven them off.

Calvin Newsom was the next witness for the defense. He testified that he went to Norris's house with defendant in May, 1886, to get defendant's things. They got everything that de-

fendant owned except a yoke of oxen and a sulkey plow, on which Norris claimed to hold but a partially satisfied mortgage. Defendant claimed to have paid off the mortgage in full, and he and Norris got into a dispute over the matter. Norris finally ordered the defendant off his place; called him a "God d—d thieving, lying son of a b—h," and told him that if he ever came on his place again he would not leave a grease spot of him. Norris then picked up an iron colter and started towards his gate, defendant being on the outside, with a stone in his hand, which he caught up after Norris caught up the iron colter. Witness held the gate, and would not permit Norris to go through it. Defendant had worked for witness, and witness knew him well. He could not say that defendant was or was not of unsound mind, but knew that at times his mind was "wavey." The witness mentioned several instances of eccentric action on the part of defendant which led him to believe that, at times, the defendant's mind was "wavey." He thought that the defendant would be much more easily provoked to do a rash act than ordinary people. He appeared to be constitutionally afraid of everybody, and to think that everybody meditated an injury to him. On his cross examination, the witness said that he thought the defendant was sound enough of mind to understand and comprehend the nature and illegality of murder.

Thomas Richey testified, for the defense, that when he married the defendant's sister, thirty-two years ago, the defendant was one of the most promising young men in east Tennessee. Fifteen or sixteen years ago he came to Texas for the first time, and was then a perfect type of the intellectual, Christian gentleman. A few years later, he went back to Tennessee. Witness heard from him often. He finally received a letter from defendant, saying that he was going to get married, and wanted witness to send him one hundred dollars. He wrote that he did not especially need the money, but could not marry until he got it. Witness answered him kindly, stating that it would inconvenience him to withdraw that much money from his business at that time, and that if, as he, defendant, wrote, he did not specially need the money, he would not send it. Defendant replied with a very insulting letter. Witness then wrote to the girl he said he was to marry, which infuriated defendant more, and he wrote witness another insulting letter. Some years later, defendant wrote to witness for money from the Mississippi bottom, where he was sick. Witness sent the money, and long after-

wards received another letter from defendant, in east Texas, and sent him money. Defendant then came to witness's house, and witness found him to be in every respect a changed man, and a confirmed woman hater. He started in to make a crop with witness. He worked from February to the first of April, when he cut into an April fool pie, made by witness's daughter, which so infuriated him that he refused further relations with witness's family, and left the house. When witness's crop was laid by, he sent word to defendant to meet him in town for a settlement. Witness and defendant failed to agree. Witness admitted an indebtedness to defendant of nineteen dollars, and defendant sued witness for seven hundred dollars, and got judgment for the nineteen dollars admitted. Witness had not seen defendant since that fall (1881), but frequently heard of him going through the country from place to place. Witness had never entertained hard feelings toward defendant, because he did not believe the defendant to be accountable for all that he did. His mental condition has never been what it was when he left Texas to go back to Tennessee. Witness regarded him as a man who would be more easily provoked by fear to do a rash act than an ordinary man in full possession of his faculties. He could not say that defendant was too weak of mind to know the criminal nature of murder.

Other witnesses were introduced by the defense, and examined as to their knowledge of the defendant's mental condition. They concurred in the belief that the defendant was a "crank," and at times subject to peculiar mental perturbation. Each gave instances of eccentric conduct on his part, but declared that, while they believed the defendant to be a man more than ordinarily prone to do a rash act through fear, he still had mind enough to comprehend the criminal nature of murder.

The motion for new trial raised the questions discussed in the opinion.

*Anderson, Flint & Anderson,* for the appellant.

*J. H. Burts,* Assistant Attorney General, for the State.

HURT, JUDGE. Appellant was indicted, tried and convicted for the murder of D. P. Rice, and the death penalty was assessed. But two questions presented by the record are noticed: 1, Were the dying declarations properly admitted in evidence? 2, Was

there error in the charge of the court in omiting to instruct the jury as to the law applicable to a homicide to prevent an illegal arrest?

As a predicate for the dying declarations, these facts were testified to by Grimes, the brother-in-law of the deceased: "I saw deceased about dark on the fifth day of August, 1886; he seemed to be very much exhausted and suffered considerably." Doctor Wirt says: "On the morning of the fifth of August I attended D. P. Rice, who was wounded. I found him one and a half miles south of Eddy, in Falls county. He was lying on his chest, face downward, and on his arm, in the shadow of a wagon; he recognized me. I considered him very seriously wounded; it was with a large ball, which passed through the arm and right side, entering the body about one and a half inches to the right of the right nipple, passing out and breaking the eighth or ninth rib. The wound was fatal. He seemed to think he was in a critical condition at the time. He asked my opinion about his condition, and what I thought I could do for him. I finally told him I thought the wound a very grave one, and he asked for his mother and family to be sent for. A young man started to unbutton his coat, and I (the doctor) told him to rip it off, and Ri·e remarked: 'Yes, cut it off; I don't suppose I will have any more use for it any way.' He appeared very much exhausted from loss of blood, and it took him some half or three quarters of an hour to say what he did to me. He said it hurt him to talk, and I could not understand more than half he said." Rice did not rally from the time the doctor first saw him until his death, which was about nine o'clock on the next day. He made his statement on the morning of the shooting.

As a predicate for the introduction of the declarations of the deceased, the State must prove four propositions of fact: First, that the deceased, at the time of making such declaration, was conscious of approaching death, and believed there was no hope of recovery; second, that such statement was voluntary, etc.; third, that such statement was not made in answer to questions calculated to lead him to make any positive statement; fourth, that he was of sane mind at the time of making the declaration. (Art. 748, Code Crim. Proc.)

Now, we are not satisfied with the truth of the first and fourth propositions. When the doctor arrived deceased recognized him, and asked what he thought of his condition, and asked that his family should be sent for, etc. We are not informed how long

this was before the declaration was made; but the physician informs us that not more than half deceased said could be understood.   We are left in the dark as to whether this was caused by exhaustion or mental incapacity.   This is a vitally important question.   The proof as to whether or not he was conscious of approaching death, etc., was meagre where it should have been full and unequivocal.   Appellant is convicted of a capital offense, and the judgment of the court below forfeits his life to the violated law.   We must, therefore, be reasonably certain that all the forms of the law have been complied with.   Under the facts shown by the record, we do not believe the declarations admissible.

It appears that complaint was made before W. H. Dykes, a justice of the peace in Bell county, charging appellant with an assault and battery.   The justice issued a capias, which was delivered to one Norris, he being specially deputized ; but that deceased, being a constable of Bell county, received it from Norris. There is evidence going to show that deceased attempted to arrest appellant in Falls county, and that the killing occurred in the prevention of this arrest.

The question presented for discussion is, can a peace officer legally arrest a party accused of crime, beyond the limits of his county?   The complaint was made before a Bell county justice, and the capias was issued by him.   Under this capias a Bell county constable attempts to arrest the accused in Falls county. We conclude that the constable had not the right to make the arrest.   Articles 229, 230 and 231, of the Code of Criminal Procedure have no application to the facts in this case.   By article 238, the justice's warrant is perfectly worthless, and can not be executed in another county than the one in which it was issued, except it be endorsed by a magistrate named in article 237.   And if so endorsed, the proper officer of the county of the arrest must make the arrest.

It may be insisted that because Bell county, under the facts of this case, might have had jurisdiction of this offense (Code Crim. Proc., art. 209), that, therefore, the constable of Bell county would have the right to make the arrest.   Article 209 has no reference to the powers of peace officers to make arrests. Its object was to settle, in some cases, very troublesome cases of venue.   The constable, if appellant was beyond the limits of Bell county, had no right to make the arrest, and the court should have instructed the jury on this phase of the case.   It

17 — TEX. APP. XXIII.

is well stated at common law and in this State, that if the homicide is committed to prevent an illegal arrest, the party, as a general rule, would be guilty of manslaughter only.

For this omission in the charge, as also for improperly admitting the dying declarations in evidence, the judgment is reversed and the cause remanded.

*Reversed and remanded.*