## WARD v. TEXAS.

No. 974. Argued May 6, 1942.—Decided June 1, 1942.

*Messrs. Leon A. Ransom* and *W. Robert Ming, Jr.* for petitioner.

*Messrs. Pat Coon,* Assistant Attorney General of Texas, and *Spurgeon E. Bell,* with whom *Mr. Gerald C. Mann,* Attorney General, was on the brief, for respondent.

MR. JUSTICE BYRNES delivered the opinion of the Court.

Petitioner William Ward, a negro, was indicted at the September 1939 term of the District Court of Titus County, Texas, for the murder of Levi Brown, a white man. He was placed on trial at that term but the jury

was unable to agree upon a verdict. At the January 1941 term he was again tried and found guilty of murder without malice, the jury assessing his punishment at confinement in the state penitentiary for three years. Upon appeal the Court of Criminal Appeals reversed the judgment of the District Court. On the State's motion for rehearing, the Court reversed itself and affirmed the judgment. Petitioner's motion for rehearing was denied, one judge dissenting. 158 S. W. 2d 516. A petition for a writ of certiorari was granted *in forma pauperis.*

The evidence introduced at the trial was such that the jury could have drawn the following conclusions: The deceased, who was seventy-two years old, lived in Omaha, in Morris county. He had previously resided at Mount Pleasant, in the adjoining county of Titus. He went to Mount Pleasant on Saturday, June 24, 1939. On Saturday evening he was seen for the last time, talking to petitioner and a negro woman on a street corner two and a half blocks south of where his body was found. He then moved off northward along the street followed at a little distance by petitioner and the woman. A short time later petitioner and the woman returned to the corner. They separated there and she walked off to the south while he returned in the direction in which the deceased had gone. The body was discovered on Sunday morning lying in a field in grass about knee high. There were no signs of a struggle and no evidence of robbery. The skin on the neck was bruised and discolored, the face was swollen and the eyes distended. The front of the trousers was open and there was blood on the tail of the shirt. For some time the deceased had been afflicted with a heart ailment, and under advice of his physician regularly took digitalis. He had taken a dose on Saturday before leaving his home. The examing physician, however, found that death was due to strangulation.

The Court of Criminal Appeals in its final opinion denying petitioner's motion for a rehearing concluded: "It may be stated bluntly that no conviction could be sustained in the present case without the confession of appellant." The details of the confession need not be recited. It is sufficient to say that in it petitioner stated that under his agreement with deceased he was to receive one dollar; that the deceased refused to pay him and cursed him and hit him; that he grabbed the deceased, choked him for nearly five minutes, and not knowing whether he was dead or alive left him on the ground.

Petitioner contends that this confession was signed by him only after he had been arrested without a warrant, taken from his home town, driven for three days from county to county, placed in a jail more than 100 miles from his home, questioned continuously, and beaten, whipped and burned by the officer to whom the confession was finally made. We granted certiorari in order to determine whether the confession was the result of such coercion and duress that its use by the State at the trial constituted a denial of the due process of law guaranteed by the Fourteenth Amendment.

In its first opinion reversing the judgment of conviction, the Texas Court of Criminal Appeals concluded that the methods employed in obtaining the confession violated applicable Texas statutes. It added that the reversal of the conviction was "in keeping with the recent decision of the Supreme Court of the United States in *White* v. *State of Texas*, 310 U. S. 530," in which we set aside a conviction because it was based upon a confession obtained by means repugnant to the due process clause of the Fourteenth Amendment. But in its second opinion reinstating the judgment of conviction, the Court of Criminal Appeals decided that there was a conflict of evidence with respect to the issues upon which the admissibility of the confession

depended and that the question of admissibility was solely for the jury and had been submitted with proper instructions. It concluded that "no matter what our personal belief might be, we do not feel that we have, nor do we usurp the power to set aside the finding of this jury in the case at bar."

Each State has the right to prescribe the tests governing the admissibility of a confession. In various States there may be various tests. But when, as in this case, the question is properly raised as to whether a defendant has been denied the due process of law guaranteed by the Federal Constitution, we cannot be precluded by the verdict of a jury from determining whether the circumstances under which the confession was made were such that its admission in evidence amounts to a denial of due process.

The undisputed evidence shows that the signing of the confession was preceded by the following events. Petitioner was employed as a house servant in Mount Pleasant by Judge S. B. Caldwell, a member of the bar of Titus county. When the body of the deceased was discovered on Sunday, June 25, petitioner was taken to the court house for questioning along with several other negroes. He pleaded his innocence. During the examination he was slapped by a constable named Redfearn, who gave as his reason that petitioner told him he "didn't know what he was talking about and Quilla Gaddis was a liar." Having no justification for holding him in custody, the county attorney, at the request of Judge Caldwell, let petitioner return to his home. Thereafter, on Sunday and Monday, he was questioned by officers several times and reiterated his assertions of innocence. On Tuesday, the officers were still questioning several negroes in connection with their investigation of the crime. According to the county attorney, they had no evidence by Tuesday night to justify the arrest of petitioner. On that night, while petitioner was attending a party at his church in Mount Pleasant, he was called

out, handcuffed, and taken into custody by the sheriff of Morris county, which adjoins Titus county. The sheriff was not accompanied by any officer of Titus county. He took petitioner and another negro in his car and drove them out of the city to Hart's Creek, where he had arranged to meet Constable Redfearn of Titus county, the man who had slapped petitioner on Sunday. The officers then carried petitioner and two other negroes to Daingerfield in Morris county, where the deceased had resided, then to Pittsburg in Camp county, and then to Gilmer in Upshur county, where he spent the night in jail. On Wednesday night he was taken back to jail in Pittsburg. Constable Redfearn visited him from time to time, and on Thursday morning took him to Tyler in Smith county, where Redfearn placed him in the custody of two highway patrolmen, advising them of the details of the crime. About thirty minutes later, the patrolmen carried petitioner to Athens, in Henderson county, and turned him over to Sheriff Sweeten. Athens is 110 miles from Mount Pleasant. During this time he had been questioned continuously. According to the county attorney of Titus county, who questioned petitioner in three different jails on three different days, petitioner stated, once in Gilmer and again in Pittsburg, that he would be glad to make any statement that "I wanted him to make but that he didn't do it." After Sheriff Sweeten had talked to petitioner, the latter signed the confession before a county attorney. Within six hours after his arrival in Athens he was returned to Tyler. Eventually he was taken back to Gilmer, where he was kept until the trial.

These facts are not disputed. Petitioner's contention that he was beaten, whipped and burned by Sheriff Sweeten just before the confession was made, however, was squarely denied. All of the officers involved asserted that he had not been mistreated, with the exception of the slap by Redfearn. Sweeten's explanation of how the confession was

obtained was: "We just talked that confession out of him. It took us 20 to 30 minutes to get that confession." And one of the patrolmen who took petitioner to the jail in Athens stated: "We just talked to him to get that statement. Yes sir, we just sweet talked him out of it." Several witnesses who were not officers testified that they had examined petitioner's body and found no bruises or burns. Only the sheriff of Titus county corroborated petitioner's charges. He testified that when petitioner was back in the Gilmer jail several days after the confession, "I saw some marks on his neck and shoulders and arms that appeared to be cigarette stub burns. Yes sir, they were fresh. There were several of them on his body."

Conceding that the question of physical mistreatment was conclusively resolved by the jury's verdict, we return to the admitted facts. There can be no doubt that from first to last the officers acted without authority of law. The sheriff of Morris county had no power to arrest petitioner in Titus county. Without the boundaries of Morris county he had no more authority than any private citizen. *Ledbetter* v. *State,* 23 Tex. App. 247, 5 S. W. 226; *Hooper* v. *Diesher,* 113 S. W. 2d 966, 967. Nor did Constable Redfearn of Titus county have the right to take petitioner into custody. Under Article 215 of the Texas Code of Criminal Procedure, the sheriff must procure a warrant before making an arrest unless he has been advised by a credible person that a felony has been committed and that the offender is about to escape. See *Rutherford* v. *State,* 104 Tex. Cr. 127, 283 S. W. 512. And Article 217 provides that the person making the arrest must immediately take the person arrested before the magistrate if the arrest is made without a warrant. Neither the sheriff of Morris county nor Constable Redfearn made any effort to secure a warrant. Instead of taking petitioner to the nearest magistrate, they took him away from the nearest magistrate. There was no pretense that the arrest was made because of informa-

tion that he was about to escape. He had been released on Sunday after his first detention, and on Tuesday evening he was attending a party at his church, when the sheriff of Morris county arrested him.

Petitioner contends that he was moved from Titus county because the officers feared that if he were placed in jail there Judge Caldwell would apply for a writ of *habeas corpus* to secure his release, and because they would be able to obtain the confession from him more easily in a strange place. The State's answer is that the officers' purpose was to protect him from threatened mob violence.

In the first place, the procedure required by law was not observed in making the removal. Article 262 of the Code of Criminal Procedure provides that, if there is no safe jail in the county in which the prosecution is carried on, the magistrate may commit the prisoner to the nearest safe jail in any other county. Here no application was made to a magistrate for a committal to a jail in another county.

In the second place, the evidence of threatened mob violence is extremely vague and by no means adequately explains the course of the officers' activities. The only testimony on this subject is that, in Morris county where deceased lived, one or two persons had expressed the opinion that the man who killed him should be given a "neck-tie party," and that some people in Titus county had talked about the "possibility of threatening mob violence." Yet, immediately after the arrest, petitioner was taken into Morris county, where the feeling was supposedly running highest. In conversation with two attorneys in Mount Pleasant prior to the Tuesday night arrest, Constable Redfearn complained about "the trouble we were having in questioning William Ward" because of Judge Caldwell's interference. At the trial he stated: "In moving the defendant, as I have testified, the sole and only consideration in doing so was to get a statement from the negro in talking to him alone or in connection with others who

possibly knew something about the crime and I was protecting him against rumors of possible mob violence." Rolston, county attorney of Titus county, was asked at the trial whether the reason for taking petitioner out of Titus county was to prevent Judge Caldwell "from getting out a writ of *habeas corpus.*" He replied: "I do not know whether that is all the reason or not. I didn't advise the officers to take him out. . . . I know there was some plan on foot to take him out." And he testified further: "It is a fact that Mr. Redfearn and some of the other officers told me about the Edwards negro, that they were going to try to get them out of Mount Pleasant and question her and then question William and try to confront the two with the statement of each other and try to get them to break down and tell the truth about it."

Speaking of the conduct of the officers, the Court of Criminal Appeals in its first opinion said: "We give effect to the good faith and intent of the officers in moving appellant out of Titus county in order to secure his safety. Yet we cannot subscribe to the idea that it was necessary to carry him 110 miles, to Athens, Texas, for that purpose. That such was not the reason appellant was carried to Athens is demonstrated by the fact that he was kept there only twenty or thirty minutes,[1] and was carried back to Tyler immediately after he had made the confession. The conclusion is inescapable that he was carried to Athens as part of the plan to 'get a statement from the negro,' and which had failed up to that time." We are not persuaded that the initial removal of petitioner from Titus county was prompted by fear for his safety, but we concur in the

---

[1] It appears from the record that petitioner was actually in Athens for several hours. However, the significant fact that he was returned to Tyler immediately after signing the confession is not controverted. It is difficult to imagine that the object in carrying him from Tyler to Athens was to secure him from harm.

Texas Court's opinion as to the motive that prompted the officers to transport him as far as Athens.

The effect of moving an ignorant negro by night and day to strange towns, telling him of threats of mob violence, and questioning him continuously is evident from petitioner's statement to County Attorney Rolston that he would be glad to make any statement that Rolston desired. Disregarding petitioner's claims that he was whipped and burned, we must conclude that this confession was not free and voluntary but was the product of coercion and duress, that petitioner was no longer able freely to admit or to deny or to refuse to answer, and that he was willing to make any statement that the officers wanted him to make.

This Court has set aside convictions based upon confessions extorted from ignorant persons who have been subjected to persistent and protracted questioning, or who have been threatened with mob violence, or who have been unlawfully held incommunicado without advice of friends or counsel, or who have been taken at night to lonely and isolated places for questioning.[2] Any one of these grounds would be sufficient cause for reversal. All of them are to be found in this case.

The use of a confession obtained under such circumstances is a denial of due process, and the judgment of conviction must be reversed.

*Reversed.*

---

[2] *Wan* v. *United States,* 266 U. S. 1, 14; *Brown* v. *Mississippi,* 297 U. S. 278; *Chambers* v. *Florida,* 309 U. S. 227, 241; *Canty* v. *Alabama,* 309 U. S. 629; *White* v. *Texas,* 310 U. S. 530; *Lomax* v. *Texas,* 313 U. S. 544; *Vernon* v. *Alabama,* 313 U. S. 547.