RICHARD GAMBLE V. THE STATE.

No. 23291. Delivered March 13, 1946.
Rehearing Denied April 17, 1946.

The opinion states the case.

*H. R. Bishop* and *Coleman Cline,* both of Fort Worth, for appellant.

*Alfred M. Clyde,* Criminal District Attorney, and *W. R. Parker* and *W. E. Myres,* Assistant Criminal District Attorneys, all of Ft. Worth, and *Ernest S. Goens,* State's Attorney, of Austin, for the State.

GRAVES, Judge.

Appellant was convicted of the murder of Mrs. Lydia McBride, and given the penalty of death, and he appeals.

Mrs. Lydia McBride was a widow fifty-five years of age, and an employee of a substation post office located at Meacham Field, a short distance north of Fort Worth, Texas. Her hours of work were from 3:30 P. M. to midnight. On June 15, 1945, the proof shows that she rode a bus into the city of Fort Worth at about 12:35 A. M. At about 2:00 o'clock A. M. she was seen on the Polytechnic bus in such city, and alighted therefrom at a point near the D. McRae public school. At about 6:15 A. M. thereafter her dead body was found about one and a half blocks from where she had alighted from the bus, the body giving evidence of having been beaten with some blunt instrument, crushing the skull in two places, and the presence of male sperm in her parts evidencing the fact that she had been criminally assaulted. Eight days thereafter appellant was arrested at the nearby town of Maypearl, and he was charged with the offense of murder.

The record contains seven bills of exceptions, and we will attempt to discuss them in their numerical order.

Bill of exceptions No. 1 contains naught save appellant's motion for a new trial, it being but a repetition of what the remaining bills of exceptions show and need not be discussed.

Bill of exceptions No. 2 relates to the following occurrence: Mrs. O. J. Atkinson, a witness for the State, was being interrogated upon her cross-examination as follows:

"Q. You haven't in other words talked with anyone that you know of about your testimony up here today, is that right? A. No, I haven't talked - - -

"Q. Then you just dropped in as a witness, did you? A. No, no.

"Q. How come you up here? A. Just because this colored boy chased me and I reported it."

This testimony as shown by the last above set out answer was objected to "as the voluntary statement of the witness and not in response to the question," which objection the court overruled, and in a qualification to the bill we find the following preceding the first quoted statements:

"Q. Of course, you have talked with Mr. Parker and many people about this case, haven't you? A. Yes.

"Q. You have talked to a lot of people about the case, haven't you? A. Not too much, no.

"Q. Well, you have talked with these lawyers here before they put you on the stand there, didn't you? A. No, I haven't talked to them today.

"Q. You haven't talked with anyone up here at the court house that you know anything about before they put you on this stand? Is that right? A. Today?

"Q. Yes. A. No, I haven't talked with anyone.

"Q. Yesterday? A. No, not yesterday."

In connection with bill No. 2 we here advert to bill of exceptions No. 3, which last bill shows the following questions to the same Mrs. O. J. Atkinson by the State, after she had previously identified the appellant as being the person she had seen near the scene of the alleged crime just a short time prior to the time the offense is claimed to have occurred:

"Q. Where was he when you last observed him on that night? A. That night? He was just a few feet from me.

"Q. And you say you live how far? A. Two and one-half blocks.

"Q. From where you first saw him? A. That's right, and he chased me all the way down the street." The last part of this answer was objected to as follows:

"We object to that voluntary statement of the witness" whereupon the court said: "I sustain the objection to the last answer of the witness as not being responsive to the question asked;" and appellant's attorney reserved an exception "to making a statement to the jury," at which time the court instructed the jury to "not consider the last answer given by the witness for any purpose."

We are impressed with the proper allowance of the answer of the witness as shown in bill No. 2, as the presence of appellant near the scene of the crime and at about or near the time Mrs. McBride met her death was material matter as well as appellant's conduct in pursuing this lady might have some bearing on what caused some one to attack and outrage the deceased lady. Again, we do think that in bill No. 3 this answer was not responsive to the question, and the careful trial court was correct in withdrawing the answer from the jury. Surely no error can be predicated on the "making of the answer" since the same statement was properly admitted in the matter shown in bill No. 2.

Bill of exceptions No. 4 brings forward appellant's objections to the court's charge, his first objection being because the weapon offered in evidence as the one used in the assault upon the deceased was not a deadly weapon per se, nor one ordinarily calculated to produce death, and appellant requested a charge herein on an aggravated assault. To the same effect are paragraphs 2, 3 and 4 of such objections, and we note that the trial court gave such a charge to the jury; he also charged on an intent to kill in connection therewith. Appellant also reserved an exception to the court's refusal to charge the jury on the law of self-defense. It will be observed that appellant did not testify in the trial of this case before the jury, but the request to charge on the law of self-defense is based upon statements appearing in the confession of appellant introduced before the jury at this trial, one of such statements found therein being that when he first appeared before the deceased lady, "I walked out on the sidewalk and the lady hollered 'Oh'. She had her purse in her hand down by her side and she jerked it up with both hands against her breast. I struck her on her head with the iron pipe. When I hit her the first time she fell on the sidewalk, and I says, 'Oh, my goodness,' and grabbed her up in my arms." It is doubtless contended that the gesture of the lady in grasping her purse with both hands and bringing it up against her breast was an indication of an intent or purpose to strike appellant with such purse, but we are not impressed with such reasoning. There was no hostile move nor intent evidenced further than this involuntary gesture of self-protection. Again it is insisted, however, that a further statement found in such confession was a fair basis upon which the court should have given a charge on self-defense, the statement being as follows:

"* * * There were some other things in this purse which I threw away as I was going east on Millett St. towards my mother's. I was looking for a pistol in this purse. I went on to my mother's that night and stayed all night."

There appears nothing further in such confession relative to such statement, and there is nothing shown that would evidence a thought upon appellant's part that Mrs. McBride was attempting to procure a pistol from this pocketbook with which to do him bodily harm. There is no proof that a pistol was in such pocketbook, and appellant did not testify before the jury in this cause. To say that from these two circumstances alone shown in the proof, and gathered from the confession, there was even a remote possibility that appellant thought this unfortunate lady

was about to attack him would be stretching the fanciful beyond the bounds of reason.

Bill No. 5 is concerned with a remark made by the district attorney in argument to the jury in which that officer made the following statement, after having passed some remarks complimenting the method in which appellant's attorneys had conducted the defense:

"And they also took it on themselves to see (say) that my office and the various other law enforcement officers in this county attempted to conceal or misrepresent some facts, well at this time, gentlemen, with the permission of this court and at your request, I will say that you can have anybody testify, you can introduce anything you want to. I say that to you right now." The district attorney paused briefly and then resumed as follows: "I take it by your silence, that every fact that you want to have introduced on this witness stand has been introduced." Upon objection the trial court sustained such objection and instructed the jury to disregard the same. This bill is qualified by the trial court with excerpts from the argument of appellant's counsel, and, after a careful reading thereof, we are impressed with the idea that such a statement of the district attorney made to counsel came well within the ground of having been invited by argument of appellant's diligent counsel, and evidences no error.

Appellant's bill of exceptions No. 6 complains of the following colloquy regarding the testimony of Mr. J. C. Smith, he being the witness to whom appellant was said to have delivered a watch, identified as that of the deceased lady. It was shown by Mr. Smith that appellant offered to sell to him this watch, but Smith refused to buy the same, but did offer to give appellant credit therefor upon a bill evidently owed to him by appellant. At this juncture one of appellant's attorneys then propounded the following questions:

"Q. Now, you say that he did owe you a bill? A. That is right.
"Q. And had a good credit rating with you, didn't he? A. I'll just be honest with you, the nigger had always been fair with me."

Whereupon the assistant district attorney requested the trial court to withdraw this answer from the jury, stating: "If he wants to put his reputation in issue he knows how to do it." Upon the court sustaining such request for a withdrawal of

such answer, District Attorney Clyde made the statement, "And we'll be happy to have him do it." Again the trial court instructed the jury:

"Again, I will tell you gentlemen, you will not consider for any purpose any statement made by counsel for either side which are directed to me for any purpose in the case, particularly the statement just made."

The witness Smith who made the statement first above complained of had previously testified that appellant had attempted to sell to him a lady's watch, afterwards identified as the deceased lady's watch, and Smith refused to purchase the watch, but did agree to take the watch and give appellant credit for its agreed value on a bill owed Smith by appellant. We do not think that the volunteered answer of Mr. Smith could have been utilized by the jury as an indication that witness Smith would probably have given testimony favorable to appellant as to his reputation for honestly and fair dealing, and was properly excluded by the trial court, and we do not think the remark of District Attorney Clyde was of such a nature that same could not have been eliminated from the minds of the jury by the prompt instruction given by the court as above set forth.

Bill of exceptions No. 7 deals with the admission of a purported confession of appellant, and finds itself in a peculiar position.

Appellant did not take the witness stand and testify in the presence of the jury. However, upon proffer of the statement complained of, the jury were retired and an extensive hearing was had relative thereto before the judge "for the purpose of determining the voluntariness and admissibility of the alleged confession," such testimony covering sixty pages of the transcript. It appears therefrom that appellant was arrested on the eighth day after Mrs. McBride met her death, at the town of Maypearl, 52 miles from Fort Worth; that the officers arrived in Fort Worth about 6:30 in the afternoon, on a Saturday, with appellant in custody; that they were seeking the location of appellant's mother's home, evidently the purpose being to find the route and destination of the person who killed and robbed Mrs. McBride. Appellant showed the officers where his mother lived, and he was then taken to the jail and confined there. The peace officers then began a search for a witness, Mrs. O. J. Atkinson, who had reported to them that she had seen and was pursued by a man near the place where the deceased's body

was found on that same night, and after a search in two counties this Mrs. Atkinson was found about midnight, and she came to the jail and evidently identified appellant as her pursuer. Appellant then went to sleep, and was taken out of the jail to an office at about 8:30 on the ensuing Sunday morning, and the officers began questioning him about this matter. It is not claimed that anyone struck him or evidenced any violence towards him, but he did claim that they cursed or cursed at him, and finally unless he confessed to this crime they "asked me did I want to get about two or three hundred colored homes burned up, and my mother's and them all burned up and tore all up." Appellant claimed that two certain men told him this. He then decided he wanted to talk to Mr. Clyde, the district attorney, who had not questioned appellant. Mr. Clyde was sent for and appellant endeavored to make a trade with the district attorney, mentioning a term of 25 years in the penitentiary. The testimony before the judge shows that Clyde refused to make a trade with appellant, and called in witnesses, and gave appellant the statutory warning, whereupon appellant admitted the killing of this lady, and told Clyde that Mr. Smith at Maypearl had the watch. The sheriff, Mr. Rhodes, was in Maypearl at that time, and a deputy who heard the statement about the watch immediately phoned Sheriff Rhodes, who obtained the watch and brought it back, and it was identified as Mrs. McBride's watch. At this interview appellant admitted the killing of the deceased and signed a written statement relative thereto, but same was not offered in evidence either in the hearing before the court or before the jury. This matter occurred prior to the noon hour, and according to the peace officers' testimony this statement contained matters that were thought to be not true. Doubtless appellant was again questioned soon after the watch was brought to Fort Worth, and sometime in the afternoon he made the statement introduced in evidence to Mr. Parker, an assistant district attorney. Appellant stated in this examination before the court that Mr. Parker cursed at him also, but claims no physical mistreatment, but does claim that in "the routine" everybody but Mr. Clyde cursed or cursed at him. Each separate person, who it was claimed by appellant cursed him, was placed on the stand at this hearing, and all denied any cursing or threatening by them, or in their presence. With this issue joined before the trial court, and with no testimony thereof before the jury, the trial court permitted this last statement to go to the jury. Under the peculiar circumstances of this case we see no other course open to the court. Surely with the contradiction of appellant's testimony by all the other witnesses, we could not be expected to hold as a matter of law that this

statement was an involuntary one, or that it was extorted from appellant by means of violence or threatened violence upon the part of the peace officers. Had the appellant taken the witness stand before the jury, probably the court would have been justified in submitting the question of the voluntariness of the statement to the jury for their determination, but no testimony attacking this statement was given to the jury, and the trial court found himself in the position where he had to decide a question of fact on the uncontradicted testimony of the State before the jury showing a voluntary confession. Appellant gave no testimony of a contradictory nature save in this hearing outside of the presence of the jury.

There was a further objection offered to this statement to the effect that same was not signed by appellant, and was witnessed by the sheriff, a peace officer. Art. 727, C. C. P. does provide that: "If the defendant is unable to write his name, and signs the statement by making his mark, such statement shall not be admitted in evidence, unless it be witnessed by some person other than a peace officer, who shall sign the same as a witness." The facts herein seem to show that appellant could write his name, and in this instance he signed his name by means of printing the letters of his name rather than writing same by means of Spencerian characters. We think it is sound reasoning to say that when one has printed his name he has written his name. It is remembered that he did not sign by making his mark, but that he signed by means of printed characters, and thus fulfilled the statute above quoted. If such reasoning be sound, then a peace officer would be a proper witness thereto.

. A resume of the objections made to this admitted confession being that same was not properly signed by appellant, but the signature thereon falls within the category of being signed by a mark; that inducements were held out to appellant in order to get him to make this statement by telling him that it would be lighter and easier on him if he would go ahead and make the statement; and that a mob would burn some 200 or 300 houses, including that of the mother of defendant, unless he did make the statement.

All these matters were contested and denied by witnesses before the court, but no mention of same was made before the jury, and the trial court of necessity could not say as a matter of law or of fact that such statement was involuntary, and having no opportunity of hearing appellant's version thereof before

the jury, we feel that the course pursued by the court was a carrect one, and the only one to which he had recourse.

There was an autopsy performed upon the body of deceased. It was shown therefrom that both sides of her skull had been crushed, probably an interval between the first stroke and the second stroke; there were five prints as of finger nails on the inside of each thigh, and sperm remaining within her body after death in such manner as to evidence the fact that she never arose after having been violated. The extravasated blood in her head evidenced the fact, so the witness said, that after the first stroke thereon she lived an interval, and with the last stroke the spinal cord was broken and death was instantaneous.

The only point at issue remaining herein is the fact that appellant was questioned for some time by peace officers, as one witness said "in relays." It is shown that under questioning from about 8:30 in the morning until about 1:30 in the afternoon, at which time appellant indicated his desire to talk to Mr. Clyde, at which time he admitted the killing of Mrs. McBride. Later on, the same afternoon and before the hour for the evening meal, he made the statement introduced in evidence. It has been held in the case of Newman v. State, 187 S. W. (2d) 566, in a quotation from Lyons v. Oklahoma, 322 U. S. 596, 64 S. Ct. 1208, 88 L. Ed. 1481, that "The mere questioning of a suspect while in the custody of police officers is not prohibited either as a matter of common law or due process."

Cited in support thereof are the cases of Lisenba v. California, supra, (314 U. S. 219, 62 S. Ct. 280, 86 L. Ed. 166) and Ziang Sun Wan v. United States, 266 U. S. 1, 14, 45 S. Ct. 1, 69 L. Ed. 131, 148.

In the presence of the death penalty, we can only say that such was the province of the jury; that the appellant has been ably defended by diligent and resourceful counsel, and we see no reason to disturb the finding of the jury herein.

There being no error shown, the judgment will be affirmed.

ON APPELLANT'S MOTION FOR REHEARING.

BEAUCHAMP, Judge.

Appellant has filed a very pointed, concise and forceful motion for rehearing, in which he sets out that his Bill of Excep-

tion No. 7 "shows that this negro was questioned by various officers in relays of two at a time, from about 5 o'clock on Saturday afternoon until about 5 o'clock the following Sunday afternoon, and that there were only slight intermissions for the appellant to have a bite to eat, or relax." The writer entertains the view that such conduct, if indulged, could be sufficient to break the resistance of the accused and wring from him a confession in writing. Whether true or untrue, such confession, if by any means forced, would become inadmissible. Abston v. State, 141 S. W. (2d) 337; Ward v. State, 158 S. W. (2d) 516, Id., 316 U. S. 547, 86 L. Ed. 1663, 62 S. C. R. 1139.

There is a further assertion, in the motion, that the officers obtained one confession which did not suit them; and that this led to a second one, made later in the day, which was introduced in evidence. If the record sustains the contention as to the involuntary nature of the first confession, the presumption may rest that the second one was obtained as a result of the same force which produced the first. Cavazos v. State, 172 S. W. (2d) 348.

These questions we consider settled by the decisions of this court and by the Supreme Court of the United States. As a consequence of the above quoted excerpt from the motion for rehearing, together with other charges contained therein, we have examined the record with the greatest possible care and fail to find evidence sufficient to sustain the contention. Furthermore, the evidence which was given on the subject was sharply contested. This boy, shown to have been many times convicted of felonies, gave a statement in conflict with that of all of the officers whom he involved. The trial court heard his testimony and passed upon the question of fact thus raised. It is inconceivable that anyone should expect the trial court to accept the testimony of this boy, accused and shown by other evidence beyond any reasonable doubt to be guilty of one of the most heinous crimes to be found in the records of the court, against the direct and positive testimony of a large number of reputable citizens of the county. Not only is it without the province of this court to set aside that finding of fact by the trial court, but it would appear to be most unusual for us to do so, if it were within our power. In the view of the writer, the original opinion correctly states the rule as to questioning a party. There is nothing in the evidence of the accused to even raise the issue. He only says that they talked to him at intervals, not continuously in relays, from Saturday afternoon until Sunday afternoon. He

was brought out of the jail several times, in the investigation, prior to about one or two o'clock in the morning. The officers waited until this late hour in order to bring a lady who was reported to have been attacked by the appellant, near the scene of his crime, within a few minutes of the very time the murder was committed. She came, viewed him under different makeups and light conditions, and positively identified him. Her testimony is pertinent and important in the case. The officers had arrested a large number of negroes, made investigation, and turned them loose.

The appellant, himself, made no charge in his statement that would show any force or undue persuasion. We quote from his statement, page 61 of the Transcript:

"A. Mr. Rhodes mentioned about to tell them all about it. I tell him I didn't know. He said he know I did, BUT HE DIDN'T FORCE ME."

Again, page 66 (on cross-examination):

"Q. And you know nobody didn't over-persuade you or anything. A. They didn't beat me up or nothing, no."

And again, page 71:

"Q. I want to get you straight. You say that the officer over here to my right, Mr. Shelton, cursed you? A. Yes, sir.

"Q. What did he call you? A. Oh, not nothing so bad."

Then he explained that they cursed in his presence and cursed at him, but we see no indication in his own testimony of any threat, direct or indirect. He makes some indefinite claim that something was said about a race riot, the burning of a large number of negro homes, that of his mother, etc., but we find no force in this. The record shows that he had fairly regular hours of rest, that he lost no meals, and that they only questioned him. The right to do so is discussed effectively in the original opinion.

It is argued in the motion that he was a very ignorant negro, easily influenced. The language used by him reflects intelligence above the average of one of his race in the community and certainly no lack of understanding of the language used. He had had ample experience with officers, having been many times in jail and serving long in the penitentiary. The surroundings could not be presumed to have any unusual influence in

creating fear. In fact, we find nothing in the record to substantiate the claim that he was unduly influenced into making the statement. He chose the District Attorney as the one to whom he should make the statement and, without contradiction in the record, he entered into negotiations with the District Attorney in an effort to get an agreement for a penalty of 25 years. It occurs to the writer that he displayed unusual intelligence, composure, and forethought in the matter.

In view of all of the evidence of the case, there can be no doubt of his guilt and that his victim was not only murdered, but that she was ravished by him—a fact which he carefully refrained from admitting.

The appellant's motion for rehearing is overruled.