## ZIANG SUNG WAN *v.* UNITED STATES.

CERTIORARI TO THE COURT OF APPEALS OF THE DISTRICT OF COLUMBIA.

No. 127.   Argued April 7, 8, 1924.—Decided October 13, 1924.

1. A bill of exceptions in the Supreme Court of the District of Columbia, held properly settled by the Chief Justice of that court, where filed in due time but after the death of the justice who presided at the trial.   P. 9.
2. A confession of guilt is voluntary in law if, and only if, it was in fact voluntarily made.   P. 14.
3. In the federal courts, the requisite of voluntariness is not satisfied by establishing merely that the confession was not induced by a promise or threat.   *Id.*
4. A confession may have been given voluntarily, although it was made to police officers while the maker was in custody, and in answer to an examination conducted by them.   *Id.*
5. But a confession obtained by compulsion must be excluded, whatever may have been the character of the compulsion, and whether the compulsion was applied in a judicial proceeding or otherwise.   *Id.*
6. Where the undisputed facts show that oral statements and a written confession, offered in evidence against a defendant charged with murder, were obtained through compulsion applied by police officers, they should be excluded from the jury.   P. 15.

289 Fed. 908; 53 App. D. C. 250, reversed.

CERTIORARI to a judgment of the Court of Appeals of the District of Columbia, affirming a sentence for murder.

*Mr. William C. Dennis* and *Mr. Frederic D. McKenney,* with whom *Mr. John W. Davis, Mr. James A. O'Shea, Mr. Charles Fahy* and *Mr. James A. Nolan, Jr.,* were on the brief, for petitioner.

Petitioner's statements were confessions.

The Court of Appeals overruled petitioner's exception to the admission of one of the statements complained of on the ground that it was a " mere casual observation which an innocent bystander might have made," and with respect to another statement the court said: " The term ' confession' has no application to a mere admission or statement of an independent fact from which guilt may be inferred, or even to incriminating acts. *State* v. *Campbell,* 73 Kan. 688; *Rusher* v. *State,* 94 Ga. 363. In other words, an admission, not of guilt, but tending merely, in connection with other facts, to establish guilt, does not amount to a confession. *McGehee* v. *State,* 171 Ala. 19, 21; *People* v. *Jan John,* 144 Cal. 284; *State* v. *Willis,* 71 Conn. 293; 2 Wigmore on Evidence, § 1050."

It is submitted that such rulings amount to a plain departure from the federal rule with respect to confessions laid down in *Bram* v. *United States,* 168 U. S. 532, where this Court quoted with approval from a note to § 219 of Greenleaf on Evidence: " The rule [relating to confessions] excludes not only direct confessions, but any other declaration tending to implicate the prisoner in the crime charged, even though, in terms, it is an accusation of another, or a refusal to confess."

Wigmore on Evidence, cited by the Court of Appeals, does indeed support the doctrine enunciated by that learned court, but even Wigmore admits that the federal rule is otherwise. Wigmore on Evidence, 1st ed., § 821, p. 929, footnote 2.

Petitioner's confessions were not voluntary. His general situation rendered his confessions involuntary. He was a young Chinese, twenty-four years old at the time of the events in question. He was a sick man of whom the jail physician testified that he found him " very weak, very much exhausted, very much emaciated," and that in his opinion petitioner " would do anything to have the torture stopped." He was held *incomunicado* for a week before the first of the alleged confessions with one or more police officers constantly in his room, subjected to ceaseless questioning, denied the right to communicate even with his brother similarly held in the same hotel, and thereafter was taken to the scene of the crime and questioned during the whole night without any opportunity for sleep, and then removed to a police station, charged with the crime and thereafter further questioned.

The alleged oral confessions and written confession obtained by this process were inadmissible irrespective of whether they were obtained by any specific threats or promises on the part of the police.

" The first of these statements [i. e., the, statement ' that there was no general rule of law by which the admissibility of a confession could be determined '] but expresses the thought that whether a confession was voluntary was primarily one of fact, and therefore every case must depend upon its own proof. . . . The rule is not that in order to render a statement admissible the proof must be adequate to establish that the particular communications contained in a statement were voluntarily made, but it must be sufficient to establish that the making of the statement was voluntary; that is to say, that from the causes, which the law treats as legally sufficient to engender in the mind of the accused hope or fear in respect to the crime charged, the accused was not involuntarily impelled to make a statement, when but for the improper influences he would have remained silent." *Bram* v. *United States*, 168 U. S. 532, 549.

In accord: *Purpura* v. *United States,* 262 Fed. 473; *People* v. *Brockett,* 195 Mich. 169; *Ammons* v. *State,* 80 Miss. 592; *State* v. *Thomas,* 250 Mo. 189; *State* v. *Powell,* 258 Mo. 239; *People* v. *Loper,* 159 Cal. 6; *People* v. *Quan Gim Gow,* 23 Cal. App. 507; *Commonwealth* v. *McClanahan,* 153 Ky. 412.

In *People* v. *Quan Gim Gow, supra,* the court said: " While no physical force was used and neither threats nor promises made, there can be no doubt at all but that the repeated questioning of the officers, like the constant dropping of water upon a rock, finally wore through his mental resolution to remain silent."

The record shows that petitioner's alleged confessions were induced by specific threats or promises within the meaning of the rule as laid down in *Bram* v. *United States, supra.*

Petitioner's confession was " a suggested confession " not corroborated by any subsequently discovered fact and inconsistent with many facts shown by the record.

Petitioner's confessions being involuntary as a matter of law, it was error for the trial court to leave to the jury the question of their admissibility. *West* v. *United States,* 20 App. D. C. 347.

Petitioner's rights are safeguarded under the Fifth Amendment, which commands that no person " shall be compelled in any criminal case to be a witness against himself." *Bram* v. *United States, supra.*

*Mr. Peyton Gordon,* with whom *Mr. Solicitor General Beck* and *Mr. J. H. Bilbrey* were on the brief, for the United States.

No set of facts or circumstances, short of a clear promise of temporal benefit or threat of temporal harm, has infallibly the effect of making a confession involuntary.

The ultimate question whether a confession is involuntary must be decided, not by judicial precedent, but by inference from the evidence of the particular case.   The

position of the defendant is that *Bram* v. *United States,* 168 U. S. 532, denounces as inadmissible every confession made in answer to an accusatory question. In substance it denounces only confessions not voluntarily made. But in arriving at the conclusion that the confession in that case was involuntary, this Court dealt solely with the facts in the case.

The duty in determining from the facts in evidence whether a confession is or is not voluntary devolves in the first instance upon the trial court, which must necessarily be vested with a large discretion in the matter. *Hopt* v. *Utah,* 110 U. S. 574; *Mangum* v. *United States,* 289 Fed. 213; *Brady* v. *United States,* 1 App. D. C. 246; *Hardy* v. *United States,* 3 App. D. C. 35; *State* v. *Hopkirk,* 84 Mo. 278; *State* v. *Rogoway,* 45 Ore. 601; *State* v. *Squires,* 48 N. H. 364.

The testimony touching defendant's general situation does not bear out the claim that he was held *incomunicado.* He was housed in a public hotel, used the telephone to New York, was visited by a physician, and, with the exception of not seeing his brother, he had every request gratified. Nor can it be truly said that he was continually questioned. He was questioned about the triple murder. Indeed, he asked many questions about it himself. He came to Washington for the purpose, so he stated, of giving what assistance he could in finding the murderers of his friends. The situation of Bram was in no wise analogous to the situation of the defendant. Bram had been put in fear. Cf. *Murphy* v. *United States,* 285 Fed. 801.

The opinion in the *Bram Case* does not mean that a man in custody cannot be a "free agent." Defendant, though persistently questioned, was not compelled to talk. The testimony shows that many times he stated to the officers that he did not want to talk any more, and when he did they left him alone.

An inspection of the record at every point where defendant's brief claims that he was persistently questioned and made to talk will make it clear that, whatever might have been their persistence in the particular instance and at that time, he did not talk. All of these circumstances show that defendant talked when he wanted to talk and refused to talk when he did not want to talk, which shows that he was a free agent.

Nor does the evidence show that specific statements were made amounting to threats or promises.

Notwithstanding some early English cases to the contrary, an exhortation that the defendant "had better tell the truth," would not make his confession inadmissible. *Queen* v. *Reeve,* L. R. 1 C. C. 362; *Reg.* v. *Garner,* 3 *Cox* C. C. 175; *Murphy* v. *United States,* 285 Fed. 801; *Aaron* v. *State,* 37 Ala. 106; *Huffman* v. *State,* 130 Ala. 89; *King* v. *State,* 40 Ala. 314; *Steele* v. *State,* 83 Ala. 20; *State* v. *Kornstett,* 62 Kans. 221; *Heldt* v. *State,* 20 Neb. 492; *People* v. *Kennedy,* 159 N. Y. 346; *Fouts* v. *State,* 8 Oh. St. 98; *Roszczyniala* v. *State,* 125 Wis. 414; *State* v. *Staley,* 14 Minn. 105; *State* v. *Anderson,* 96 Mo. 241; *Hintz* v. *State,* 125 Wis. 405.

The decision in the *Bram Case* was upon but two grounds: (1) That Bram was put in fear, and therefore deprived of the freedom of mind, as a result of being brought to the detectives' office and denuded of his clothing, and (2) that he was told that one Brown had seen him do the murder, thereby placing Bram in the situation where, if he remained silent, his silence might be used as evidence against him, tending to establish by conduct an admission of the crime. He was thereby compelled to speak out about his connection with the crime. The introduction in evidence of the statement thus made by him amounted to forcing him to give testimony against himself in violation of the Fifth Amendment.

The defendant would have it that when the facts and circumstances surrounding the commission of a crime

point the finger of suspicion to a person, that person may not be placed under surveillance nor in custody for the purpose of ascertaining what he knows about the crime. If placed under surveillance or in custody, he must neither be told the facts and circumstances in the case nor be asked what he knows about it. If he is placed under surveillance or taken into custody, he is not, says the defendant, a free agent. Therefore, whatever he may say about his connection with the crime is inadmissible against him.

Or, stated in another way, that because he is suspected of crime, the law, says the defendant, surrounds him with protection that is denied to any other member of society. If he is told of the facts and circumstances which placed him under suspicion, or is told that he is under suspicion, it is then claimed that because of the accusatory nature of the question, or the information conveyed to him, anything he might state is involuntary.

It appearing upon the evidence that the admissions and confessions were voluntary, it was proper to submit them to the jury for its consideration.

Without so stating, defendant's brief takes the position that confessions are presumptively inadmissible, and that the Government in this case was under the burden of establishing its voluntary character before it could be admitted. There are to be found some decisions to this effect, but we submit this is not the rule in federal courts. In those courts there is no such presumption against a confession. The rule is, however, that if it appears from the evidence that a confession was in fact involuntary, it is inadmissible as evidence against the accused. *Murphy* v. *United States,* 285 Fed. 801.

The evidence, the full integrity of which can never be reflected in the bill of exceptions, touching the facts and circumstances surrounding the making by the defendant of the several statements, was heard by the trial judge

as it fell from the lips of the witnesses. It was his duty in the first instance to determine whether or not this evidence established in any degree that the confession was involuntary. The court found and ruled that the statements were not involuntary, and that they therefore should be admitted into evidence to be considered and determined by the jury

The jury were fully instructed that if they found the confession was not voluntarily made they should entirely disregard it.

The justice who presided at the trial having died, it was competent for another justice to settle the bill of exceptions. Section 953, Rev. Stats., as amended by the Act of June 5, 1900, 31 Stat. 270, is applicable to the District of Columbia. No inconsistency exists between it and § 73 of the District Code. Therefore the two statutes may be followed in the District of Columbia without the one interfering with the other. *Roney* v. *United States*, 43 App. D. C. 533. *Hume* v. *Bowie*, 148 U. S. 245, distinguished.

MR. JUSTICE BRANDEIS delivered the opinion of the Court.

On January 31, 1919, the police department of the District of Columbia learned that three Chinamen, the inmates of a house in Washington occupied by the Chinese Educational Mission, had been murdered. They were known to have been alive late in the evening of January 29. Police officers were told by Li, a student, that, earlier on the same evening, he had seen at the Mission a resident of New York City named Wan. Acting under instructions of the superintendent of police, two detectives started immediately for New York, taking Li with them. On February 1, they entered Wan's room in a lodging house, found him there, and brought him to Washington. He was not formally arrested until February 9. Later,

he was indicted, in the Supreme Court of the District, for the murder of one of the Chinamen; was found guilty; and was sentenced to be hanged. The Court of Appeals of the District affirmed the judgment. 289 Fed. 908. A writ of certiorari was granted. 263 U. S. 693.

The main question for decision [1] is whether, on the facts disclosed in the testimony of the superintendent of police, three detectives and the chief medical officer of the jail, the trial court erred in admitting as evidence statements made by the defendant to the police officers before and shortly after his formal arrest.[2] Four of the statements were oral. These, if admissible, were important evidence. The fifth was a stenographic report of an interrogation of the defendant conducted by the detectives, after the arrest. This report contained a full confession. The introduction of each of the statements was duly objected to on the ground that the Government failed to show that it had been voluntarily made and that from the testimony of its own witnesses the contrary appeared. The court admitted the statements. It later charged the jury: " The test of the case, and the inquiry that you will have to

---

[1] The indictment was found on September 30, 1919; the verdict rendered on January 9, 1920; and the sentence imposed on May 14, 1920. The time for filing the bill of exceptions, which under the rule would have expired June 21, 1920, was, on that day, extended to November 1, 1920; and it was not filed until the latter date. Before it was settled, the judge who had presided at the trial died. A motion to vacate the judgment, made on this ground, was denied on November 22, 1921. Thereupon, the bill of exceptions was signed by the Chief Justice of the Court. It was contended here, among other things, that the judgment should be set aside because a bill of exceptions can be settled only by the judge who presided at the trial. The contention is unfounded. *Roney* v. *United States*, 43 App. D. C. 533.

[2] With the exception of these statements, the Government introduced only circumstantial evidence. The defendant testified on his own behalf asserting his innocence. He described the conditions under which the statements had been made, denied or explained them, and insisted that the confession was a suggested one.

make in answer is: Did the questioning, did the physical condition, did the importunate questioning, if you choose to call it so, render the confession made by the defendant not his own; but did it substitute for his will the will of another, and thus was it or not his voluntary act?"

Wan was a native of China. He had come to the United States in 1916, at the age of twenty-two, as a student. In 1918, he engaged in a business which proved unsuccessful. Since December of that year, or earlier, his health had been bad. He had an attack of Spanish influenza. He, suffered continuously from a chronic stomach trouble which led him to eat sparingly and irregularly. When the detectives entered his room unannounced they found him in bed. They had no search warrant; but they made a search of the room and his effects, including the bed in which he lay. They were accompanied by a New York police officer; but they did not arrest Wan. They requested that he return with them to Washington. He told them he was too sick. Li, who had been left waiting outside the closed door and was called in, told Wan that both of them were suspected of the murder. Then, Wan consented to go with the detectives to Washington.

On arrival in Washington, Wan was not put formally under arrest; but he was taken to a secluded room. In the presence of three detectives, the superintendent of police, and Li, he was subjected there to questioning for five or six hours. Late in the evening of that first day, the detectives took him to Hotel Dewey; and, without entering his name in the hotel registry, placed him in a bed-room on an upper floor. In that room he was detained continuously one week. Throughout the period, he was sick and, most of the time, in bed. A physician was repeatedly called. It was a police surgeon who came. In vain Wan asked to see his brother with whom he lived in New York; who had nursed him in his illness; who had come to Washington at his request in January; who had returned with

him to New York; and whom, as he later learned, the detectives had also brought to Washington, were detaining in another room of the hotel, and were subjecting to like interrogation.

Wan was held in the hotel room without formal arrest, *incomunicado.* But he was not left alone. Every moment of the day, and of the night, at least one member of the police force was on guard inside his room. Three ordinary policemen were assigned to this duty. Each served eight hours: the shifts beginning at midnight, at eight in the morning, and at four in the afternoon. Morning, afternoon and evening (and at least on one occasion after midnight) the prisoner was visited by the superintendent of police and/or one or more of the detectives. The sole purpose of these visits was to interrogate him. Regardless of Wan's wishes and protest, his condition of health or the hour, they engaged him in conversation. He was subjected to persistent, lengthy and repeated cross-examination. Sometimes it was subtle, sometimes severe. Always the examination was conducted with a view to entrapping Wan into a confession of his own guilt and/or that of his brother. Whenever these visitors entered the room, the guard was stationed outside the closed door.

On the eighth day, the accusatory questioning took a more excruciating form. A detective was in attendance throughout the day. In the evening, Wan was taken from Hotel Dewey to the Mission. There, continuously for ten hours, this sick man was led from floor to floor minutely to examine and reëxamine the scene of the triple murder and every object connected with it, to give explanations, and to answer questions. The places where the dead men were discovered; the revolver with which presumably the murder was committed, the blood stains and the finger prints thereon; the bullet holes in the walls; the discharged cartridges found upon the floor; the clothes of the murdered men; the blood stains on the

floor and the stairs; a bloody handkerchief; the coat and pillow which had been found covering the dead men's faces; photographs, taken by the police, of the men as they lay dead; the doors and windows through which the murderer might have entered or made his escape; photostat copies of writings, by means of which it was sought to prove that Wan was implicated in a forgery incident to the murder; all these were shown him. Every supposed fact ascertained by the detectives in the course of their investigation was related to him. Concerning every object, every incident detailed, he was, in the presence of a stenographer, plied with questions by the superintendent of police and the detectives. By these he was engaged in argument; sometimes separately, sometimes in joint attack. The process of interrogation became ever more insistent. It passed at times from inquiry into command. From seven o'clock in the evening until five o'clock in the morning the questioning continued. Before it was concluded, Li, who was again in attendance, had left the Mission about midnight, worn out by the long hours. The superintendent of police had returned to his home, apparently exhausted. One of the detectives had fallen asleep. To Wan, not a moment of sleep was allowed.

On the ninth day, at twenty minutes past five in the morning, Wan was taken from the Mission to the station house and placed formally under arrest. There, the interrogation was promptly resumed. Again the detectives were in attendance, day and evening, plying their questions; pointing out alleged contradictions; arguing with the prisoner; and urging him to confess, lest his brother be deemed guilty of the crime. Still the statements secured failed to satisfy the detectives' craving for evidence. On the tenth day, Wan was "bundled up"; was again taken to the Mission; was again questioned there for hours; and there "the whole thing was again talked of and enacted." On the eleventh day, a formal interroga-

tion of Wan was conducted at the station house by the detectives in the presence of a stenographer. On the twelfth day, the verbatim typewritten report of the interrogation (which occupies twelve pages of the printed record) was read to Wan, in his cell at the jail. There, he signed the report and initialled each page. On the thirteenth day, for the first time, Wan was visited by the chief medical officer of the jail, in the performance of his duties. This experienced physician and surgeon testified, without contradiction, to the condition of the prisoner:

" [He] found . . . [Wan] lying in a bunk in the cell, very weak, very much exhausted, very much emaciated; he complained of abdominal pain, which was rather intense. He told witness, and witness afterwards saw, that he vomited if he attempted to take food; that it was difficult or impossible for his bowels to move unless they were assisted by an enema; . . . witness thought he was very seriously ill; . . . ordered certain tests by the laboratory . . . ; had his blood examined and his abdomen X-rayed and had him removed from the cell to the Red Cross room; . . . concluded he was suffering from spastic colitis: [involving contraction of the bowel.] . . . The result of that contraction would be almost constant pain, excited by any further additions to the contents of the tract at that point, and vomiting and persistent constipation. . . . Witness knows defendant was in bed at least a month after his treatment was prescribed. From witness' observation and medical experience, judging from the defendant's emaciation and history he gave witness, and his condition generally, would say that when witness saw the defendant on February 13th he had been ill for a matter of weeks. . . . He told me he had been talked to all one night and had not received any medical attention, and had been in constant pain all of this time and had been unable to eat for days, and considering all those facts I came to the con-

clusion that he was so exhausted that he was really—he told me also that he had signed a confession."

[Then the witness was further questioned by the court.]

" Question. You thought he was so exhausted mentally that he would not know what he was signing? . . . Would he know what he was signing?

Answer. He would know what he was signing, yes.

Question. Would he be liable to sign a confession that would lead him to the gallows in that condition?

Answer. I think he would, if he wanted to be left alone.

Question. With spastic colitis, if he was accused of crime he would simply sign a paper and say, ' You hang me '? That is your opinion as a medical man?

Answer. I say, if he was as sick as that and in as great pain as that, he would do anything to have the torture stopped."

The Court of Appeals appears to have held the prisoner's statements admissible on the ground that a confession made by one competent to act is to be deemed voluntary, as a matter of law, if it was not induced by a promise or a threat; and that here there was evidence sufficient to justify a finding of fact that these statements were not so induced. In the federal courts, the requisite of voluntariness is not satisfied by establishing merely that the confession was not induced by a promise or a threat. A confession is voluntary in law if, and only if, it was, in fact, voluntarily made. A confession may have been given voluntarily, although it was made to police officers, while in custody, and in answer to an examination conducted by them.[3] But a confession obtained by compulsion must be excluded whatever may have been the

_____

[3] *Hopt* v. *Utah,* 110 U. S. 574, 584; *Sparf and Hansen* v. *United States,* 156 U. S. 51, 55; *Pierce* v. *United States,* 160 U. S. 355, 357; *Wilson* v. *United States,* 162 U. S. 613, 623; *Bram* v. *United States,* 168 U. S. 532, 558; *Hardy* v. *United States,* 186 U. S. 224, 229; *Powers* v. *United States,* 223 U. S. 303, 314; *Bilokumsky* v. *Tod,* 263 U. S. 149, 157.

character of the compulsion, and whether the compulsion was applied in a judicial proceeding or otherwise. *Bram v. United States,* 168 U. S. 532.[4] None of the five statements introduced by the Government as admissions or confessions was made until after Wan had been subjected for seven days to the interrogation. The testimony given by the superintendent of police, the three detectives and the chief medical officer left no room for a contention that the statements of the defendant were, in fact, voluntary.[5]

---

[4] See also *Wilson* v. *United States,* 162 U. S. 613, 623; *Hardy* v. *United States,* 186 U. S. 224, 229; *Kent* v. *Porto Rico,* 207 U. S. 113, 119; *Powers* v. *United States,* 223 U. S. 303, 313. Compare *Counselman* v. *Hitchcock,* 142 U. S. 547; *Brown* v. *Walker,* 161 U. S. 591, 596–7; *Hale* v. *Henkel,* 201 U. S. 43, 71; *Wilson* v. *United States,* 221 U. S. 361, 379; *Perlman* v. *United States,* 247 U. S. 7, 13.

[5] This testimony occupies, in its condensed form, fifty pages of the printed record. The character of the pressure applied is illustrated by the following extracts from the testimony of the detectives:

" . . . Sometimes witness has sat and talked to him, or, rather talked at him twenty minutes or half an hour, and asked him could he explain certain phases of this case, without his uttering a word or making any reply whatever."

"A good many times during the course of the investigation he would ask to be left alone, but we did not leave him alone, and we would ask him a question, and if it was rather pointed he would say he was tired, to leave him alone, ' I will talk no more to you.' Sometimes would be twenty or thirty minutes before he would answer or say a word; . . . asked him the same questions over and over again a great many times without getting any answer at all; . . .

" . . . defendant had continuously asked to be let alone and not bothered, whenever he was asked a pointed question and if he answered it it might implicate him or embarrass him; he would say, ' Let me alone, I talk no more to you tonight, I don't feel well,' this was done repeatedly whenever he was pressed for an answer to a pointed question; sometimes we would leave him alone, and witness sometimes stayed there and talked at him for a while until we got tired of it . . . ; told defendant witness thought his sickness was more in his mind than in his body."

[On the eighth day, at the Mission] " Well, he sat and rolled his eyes when I asked him why he came out to the house the second time,

The undisputed facts showed that compulsion was applied. As to that matter there was no issue upon which the jury could properly have been required or permitted

---

why he did not go to the cafe instead of coming away out to the house, and he sat there and rolled his eyes at me, and Burlingame [another of the detectives] said, 'Answer his question,' and then he turned to his brother and started in the Chinese language, and Burlingame said, ' Here, don't speak Chinese. Answer Kelly's question.' Then he raised up with a coat hanger and Burlingame caught him on the shoulders and said, ' We don't want anything like that here.' This was about one o'clock in the morning, and we left somewhere around four o'clock; not much was said after four o'clock, just talking; Burlingame objected to defendant talking in Chinese because he wanted him to answer questions; requested him once and then set him down in the chair;   . . .

" . . .  defendant was not permitted to sleep or to go back to hotel  . . .

" . . .  witness did try to force an answer out of him by asking him to answer the questions, but not by physical force or anything of that kind  . . .  it was on that occasion [on the ninth day, at the station house, after the all-night interrogation at the Mission] that witness told defendant, ' If you are guilty, and your brother is innocent, I want to know, for I am holding your brother just the same as I am holding you.' Witness thinks he said, ' Now is the time to tell me,' intimating to him that he had been in confinement a long time and witness wanted to know something about it; they were both in confinement and witness was anxious for him to tell about his brother; was satisfied he was guilty but did not tell him so at that time; was just about that time witness said ' things look bad for you ' or ' things look black for you ' and you ought to tell me the truth. . . . Went over practically and rehashed all the case as far as they had learned about it and related all the circumstances against him; told him a lot of things, but never offered any inducement, because witness has had too much experience in that line."

[Witness went to the station house Sunday night for the purpose of still talking to him about the case.] " I wanted to straighten out a great many circumstances which pointed to him  . . .  wanted to know from him whether he was guilty; wanted him to tell the truth; asked him on a number of occasions to tell the truth, and those circumstances which pointed very strongly against him, strongly indicated to witness' mind that he knew a great deal more about the case

to pass. The alleged oral statements and the written confession should have been excluded.[6]

*Reversed.*

1. Certain railway companies, defendants in a suit successfully prosecuted by the United States under the Sherman Law, instituted contempt proceedings against their codefendants, not to vindicate the authority of the court, but to enforce rights which the petitioners claimed under the original decree and alleged that the respondents were violating. The United States did not join in the complaint or participate in the hearing in the District Court, but aligned itself with the petitioners on appeal. *Held,* that the con-

---

than he told of; that he had caught him in several contradictory statements and witness said: 'We are all firmly of the belief that you know who killed those men'; sat and watched him and looked at him carefully and for a long time after I would tell him those things and would say, 'Now, you think it over,' and stayed right there with him.

"Q. Your purpose in telling him those things was to make him talk?

"A. My purpose was to get him to tell me the truth about this case.

"Q. Answer the question, will you?

"A. Well, he had to talk."

". . . Practically every admission he made was in answer to question witness asked himelf; 'had gotten practically everything that I thought was important,' and left the details to Burlingame and Kelly."

[6] Compare *Boyd* v. *United States,* 116 U. S. 616, 631; *Weeks* v. *United States,* 232 U. S. 383, 398; *Silverthorne Lumber Co.* v. *United States,* 251 U. S. 385, 392; *Gouled* v. *United States,* 255 U. S. 298; *Amos* v. *United States,* 255 U. S. 313, 316; *Bilokumsky* v. *Tod,* 263 U. S. 149, 155; and "Progress of the Law, 1921–1922, Evidence," [Chafee] 35 Harv. L. Rev. 428, 439.