**Willie A. CRAWFORD, Appellant,**
v.
**UNITED STATES of America,**
Appellee.
No. 15032.

United States Court of Appeals,
Fifth Circuit.

Jan. 28, 1955.

Rehearing Denied March 22, 1955.

See 220 F.2d 352.

208

Lee Ducoff, Houston, Tex., for appellant.

· C. Anthony Friloux, Asst. U. S. Atty., Malcolm R. Wilkey, U. S. Atty., Houston, Tex., for appellee.

Before HUTCHESON, Chief Judge, HOLMES, Circuit Judge, and ALLRED, District Judge.

ALLRED, District Judge.

Appellant was convicted by a jury of unlawfully acquiring marihuana without paying the tax thereon, in violation of 26 U.S.C.A. § 2593(a). He was sentenced to five years imprisonment and fined one dollar, after admitting his identity as a second offender, as charged in an information filed under section 2557 (b), of Title 26.

---

Two questions are presented on this appeal: First: Legality of a search of appellant's home conducted by city officers without a search or arrest warrant. Second: whether certain incriminating statements made after arrest were voluntary.

The search question was brought on before the court in advance of trial and overruled. Appellant called two Houston city officers. So far as the testimony at that hearing is concerned,[1] the trial court committed no error in overruling the motion to suppress.[2] Appellant failed to discharge his burden.[3]

Over objection, McCleary, a federal narcotics agent, was permitted to testify that on the morning after the arrest appellant told him that the evidence seized by the city officers was marihuana, that he hadn't been a dealer very long, that he bought it from a man who used to run the Overpass Inn and that further questioning led to the name of his source. Appellant had requested that he be permitted to take McCleary on voir dire "for the purpose of ascertaining whether or not a proper warning" had been given. We think this sufficiently raised the question as to whether the statements were voluntary.

McCleary had testified on direct examination that one of the first things he did was to advise appellant as to his constitutional rights, that "he didn't have to tell me anything, but anything he did tell me might be used for or against him." This statement—that anything he might tell the officer might be used *for* appellant—standing alone would not mean a great deal but is very significant in the light of what transpired and the testimony of the city officers who were present at the time. It is noted that McCleary says that *one* of the first things, not the *first* thing, he did was to advise appellant as to his constitutional rights. All the officers say that a demand was made for production of the order form required under 26 U.S.C.A. § 2593; and that they questioned appellant as to his source of supply. The arrest had been made the night before at 8:30 p.m. Appellant and his wife were taken to the police station and questioned. They were not "booked" until 10:40 p.m., when a notation was made on the police blotter "hold for the morals division and the federal officers." McCleary was called early the next morning and, along with the arresting officers, questioned appellant. He denies making a "bargain," or knowing of any the city officers may have made, with appellant,[4]

1. On the night of June 3, 1953, the officers sent a "special employee" to appellant's residence to attempt to buy marihuana. After he reported a buy to them, they went to the house, knocked and, receiving no response, were about to leave, when appellant and his wife came up. One of the officers told appellant he had some bad information about him selling marihuana and that they wanted to search the premises. Appellant asked if they had a warrant of any kind and, upon being informed that they did not, produced a key and let them in. The officers searched and found the marihuana charged in the indictment. They arrested appellant and his wife, took them to the city jail, questioned them a short time, then lodged them in jail overnight. The next day they turned the evidence over to McCleary, a federal narcotics officer who "adopted" the case on the following day, June 5th. They denied it was their policy to file their cases in the federal courts when they could not make a narcotics case in state court.

2. United States v. Scotti, D.C., 102 F. Supp. 747; Scotti v. U. S., 5 Cir., 193 F.2d 644; Frederick v. United States, 5 Cir., 208 F.2d 712; Serio v. United States, 5 Cir., 203 F.2d 576; Burford v. United States, 5 Cir., 214 F.2d 124.

3. Batten v. United States, 5 Cir., 188 F.2d 75.

4. McCleary's testimony seems slightly evasive at times:
"Q. And do you know anything about a bargain being struck up between he and the city officers? A. No, I don't know of any bargain, sir.
"Q. Do you know of any bargain that might have been made or did they tell you anything they might have made in the way of a bargain with the defendant? A. Sir, *I am not sure I understand what a bargain is.* * * *

but admits he talked with him about his source of supply and in reference to aiding and assisting him and the city officers in catching the big suppliers; that appellant called some of them over the phone and, under supervision of the officers, went out and made purchases resulting in successful prosecutions; and that appellant "cooperated" in every way. Officer Poole, on the other hand, testified positively that on the morning of June 4th, he was present when McCleary talked to appellant as to his source of supply, that they attempted to strike up a bargain with him at that time and that appellant performed his portion of the bargain. He had further testified [5] that on the day following the arrest, when he was talking to appellant about his source of supply, that he had told appellant that "we" would release his wife.

It is clear from the foregoing that appellant's statement to McCleary was involuntary as a matter of law. The trial judge instructed the jury that they could not consider it unless the Government had proved that it was made freely and voluntarily, "that is, not in response to any force, threat or promises." This is correct in the abstract but not as applied to the facts in this case. It omits the element of hope of reward, incentive or inducement held out by the officers. They deny any express promise and the jury may well have believed that such a promise had to be express; but, as pointed out above, McCleary testified that one of the first things he did was to tell appellant that anything he said might be used *for*, as well as against him. It is logical that appellant believed from this alone that it would be best for him to tell the whole story and that he would be helping himself, or his wife, by "cooperating." Added to this is the testimony of Poole that *they* struck a bargain with him, which appellant kept; and that he told appellant that "we" would not prosecute the wife.[6] Just what the "bargain" was

"Q. Now, Officer McCleary, did you ever tell the defendant you would help him all you could in reference to this matter? A. *Not exactly in those words.* I do distinctly recall this conversation, that after talking to him, he told me that he owned all of it, that his wife had nothing to do with it, and I told him that inasmuch as she was not selling and as she had nothing to do with it, she had nothing to fear and I would not be one to prosecute her if that was the case.

"Q. That was on the morning of June 4, is that correct, sir? A. I believe that was on the morning of the 5th, sir, because as I understand you, the arrest was made on the 3rd, a Wednesday. The 4th was Friday when we *actually*—

"Q. The fourth would be Thursday, would it not? A. Yes, sir. That is correct. The 3rd was Wednesday, was it not sir? The 4th, Thursday, I did talk with him at that time. The Government had not adopted the case until Friday morning, the 5th, and that is when I *actually interrogated* the defendant and he said that it was his and I got permission from my superiors for an order *actually* to go ahead with the case and I did not file on the wife because evidently to me—

"Q. Was this before or after he made those phone calls for you all and set up those other people? A. That was the day after." (Emphasis supplied.)

5. On the motion to suppress, (R. 11):

"Q. Now, Mr. Poole, on the third day of June, which was the day following, state whether or not you had any conversation with the defendant here. A. Yes, sir.

"Q. And what was that conversation? A. I was talking to him in regard to his source of where he was getting his marihuana.

"Q. Did he act cooperative? A. He did.

"Q. And did he cooperate with you? A. Yes, sir.

"Q. Did you tell him at that time that you would not prosecute he or his wife in reference to their possession if he would aid and assist you in stamping out the root or source of the marihuana? A. No, sir. I didn't tell him we wouldn't file on him.

"Q. Just what did you tell him? A. I told him that we could release his wife.

"Q. And what did you tell him as to his own position in the matter? A. I didn't tell him anything pertaining to his case as to filing or not filing.

"Q. Now, this was on the third day of June; is that correct?"

6. Poole's insistence that he refused to agree not to file against appellant, but

the record does not show. From appellant's standpoint, it was a poor bargain since the officers had no authority to promise him immunity. But the controlling fact is that there *was* a bargain, part and parcel of the whole conversation about source of supply and "cooperation" which, while not affording immunity, relieves appellant from the use of the admission in evidence against him.[7] "In the federal courts, the requisite of voluntariness is not satisfied by establishing merely that the confession was not induced by a promise or a threat. A confession is voluntary in law if, and only if, it was, in fact, voluntarily made." Ziang Sung Wan v. United States, 266 U.S. 1, 14, 45 S.Ct. 1, 3, 69 L.Ed. 131.[8] The testimony of the Government's own witnesses clearly shows that appellant's admission to McCleary, while under arrest, was not voluntary.

■ Nor can we say that this was harmless error. Without these admissions, the record would stand: The city officers watched an informer start up the stairs to appellant's apartment; they saw him return a short time later when he delivered a package to them (which was not introduced in evidence), within 10 minutes, according to one officer, longer according to another, they went to the apartment, knocked and no one answered, although they had not seen appellant or his wife leave; they had started to leave when appellant and his wife arrived; they told him they had some bad information about him selling marihuana and

that they wanted to search; appellant and his wife denied the accusations and inquired whether the officers had a warrant of any kind; the officers replied in the negative but said they wanted to search anyway; appellant produced a key and opened the door; the officers found a small quantity of marihuana right where the informer (who "was in the racket or that dealt in marihuana") told them it would be; appellant said, "that is what you are looking for, it is marihuana." While failure to produce an order form, upon reasonable notice and demand by the collector, is presumptive evidence of guilt under 26 U.S.C.A. § 2593(a), it is not conclusive; and had it not been for McCleary's testimony that appellant said it was his, that he hadn't been a dealer very long, etc., the jury might have believed that it belonged to the informer. The absence of appellant and his wife from the apartment, the informer's identity as a marihuana dealer, his ready entry into the apartment, his telling the officers right where they would find it and the fact that no marked money was used, or found on appellant, might have created a reasonable doubt. We cannot say what the jury would have done but appellant had the right to have them pass on the question without the damaging admission made under the "bargaining" atmosphere in which it was presented.

Reversed.

HUTCHESON, Chief Judge.
I dissent.

---

only the wife, evidences a mistaken belief on his part that such a promise was proper. But *any* promise is sufficient to show that a confession is not voluntary, whether it be with reference to appellant's case only or not.

7. White v. United States, 5 Cir., 194 F. 2d 215.

8. Citing, among other cases, Bram v. United States, 168 U.S. 532, 18 S.Ct. 183, 187, 42 L.Ed. 568, in which the following is quoted with approval from 3 Russell on Crimes (6th ed.) 478: "'But a confession, in order to be admissible, must be free and voluntary; that is, must not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight * *.'"