**UNITED STATES of America ex rel. Anthony CASERINO, Relator,**

v.

**Wilfred L. DENNO, as Warden of Sing Sing Prison, Respondent.**

**No. 65 Civil 3791.**

United States District Court
S. D. New York.

Oct. 19, 1966.

Joseph M. Schwartz, New York City, for relator.

Louis J. Lefkowitz, Atty. Gen. of New York, New York City, for respondent.

Murray Sylvester, Asst. Atty. Gen., of counsel.

WEINFELD, District Judge.

Petitioner, confined to Sing Sing Prison, New York, under a sentence of two years and six months to five years imposed under a judgment of conviction entered upon a jury verdict of being an accessory to a felony and of criminally possessing a pistol (as to which a suspended one-year sentence was imposed), seeks his release upon a federal writ of habeas corpus. He contends that the admission in evidence upon his trial of an incriminating statement, the principal evidence against him, violated his federally protected privilege against self-incrimination and his right to due process of law under the Fourteenth Amendment. The basic thrust of his position is that the incriminating statement was made either under a promise of immunity or, if as the state contends no immunity was promised, that it was the product of impermissible fraudulent conduct on the part of state officials.

The basic facts which led to petitioner's indictment and conviction as developed upon the trial are as follows: On July 11, 1963 one Robert Munos was shot to death and James Warga assaulted in a New York City bar and grill. Their assailant was Frank Falco. Petitioner was in the bar when Munos and Warga entered and was seen in conversation with Falco before the homicide. He had also been observed with a pistol on his person before the shooting and with a second pistol immediately after the shooting. No witness saw Falco shoot Munos.[1]

On July 31, 1963 Warga signed a complaint accusing petitioner of acting in concert with Falco in the assault and a warrant was issued for his arrest. Some three weeks later, on August 26, 1963, while petitioner was detained in New Jersey upon an unrelated charge, Detective Pickett and Lt. Detective Fenn of

1. Warga was "cracked in the face with the gun" just before the shooting, and consequently did not see it, although he heard the shot. Record, p. 47.

the New York City Police Department, and Assistant District Attorney Hammer of New York County, sought to question him about the homicide in the office of a New Jersey prosecutor. Petitioner refused to speak to anyone except Pickett and also declined to make any statement to him until told by Pickett that the authorities needed his help, wanted his testimony, and would only use him as a witness. According to Pickett, this assurance was given after he had conferred with Assistant District Attorney Hammer. While, as hereafter discussed, there is some dispute between the latter two as to when they conferred, as well as to what transpired,[2] there is no dispute as to what Pickett told petitioner when he talked privately with him. In Pickett's own words:

> "I told him, we had a weak case in the killing of Munos; that James Warga said he was hit in the face with the gun, and he did not actually see the shooting of Munos by Falco, and I said that anything he could give us to help us that would indict Falco we would only use it before the Grand Jury.
>
> \* \* \* \* \* \*
>
> " \* \* \* that if he would co-operate, with the testimony that we got from Warga, that we would get a good case against Falco, and that we would only use him as a witness.
>
> \* \* \* \* \* \*
>
> "\* \* \* [Y]ou were not in the room when Falco had killed Munos so we know that you could not be charged with the homicide. Only thing, we were only going to use him as a witness." [3]

Petitioner thereupon consented to testify against Falco before the grand jury, though not upon the trial, and made a full statement to Pickett of events at the time of, and subsequent to, the shooting in the bar and grill. He admitted that while making a phone call he saw Falco walk up to two men who had entered the bar and walk with them toward the rear of the bar. (Falco was herding Munos and Warga into the kitchen, where Munos was shot out of petitioner's presence.) Petitioner, upon completing his phone call, walked toward the kitchen and, fearing the two men were armed and might hurt Falco, pulled out his own gun. But before arriving there he heard a shot and upon entering saw that Falco had killed Munos. When Falco also threatened to kill Warga, petitioner took Falco's gun from him, warned possible witnesses "to forget what they had seen," left the bar and later threw Falco's gun, as well as his own, into the New York Harbor.

It was principally upon these incriminating admissions to Detective Pickett that the petitioner was indicted for being an accessory to a felony (after the fact),[4] and for criminally possessing a pistol.[5] Upon the trial the admissions made to Detective Pickett were received in evidence over defense objection that they had been procured by "misrepresentation and deception of a very vital fact," were not voluntary and were obtained in violation of defendant's rights under the Fourteenth Amendment.[6] The trial judge instructed the jury that petitioner's statements to Detective Pickett were not made under the influence of fear induced by threats or under any stipulation of immunity by the District Attorney. The instruction appears to have been based upon New York's Code of Criminal Procedure governing the admissibility of

---

2. Pickett's version is that he conferred with Hammer before he made the statements to petitioner, and that Hammer consented thereto. Hammer says that they conferred after Pickett made the statements to petitioner, and that he neither authorized Pickett's statements nor ratified them.

3. Record, pp. 295-A-296.

4. N.Y.Penal Law, McKinney's Consol. Laws, c. 40, §§ 2, 1934.

5. N.Y.Penal Law, § 1897.

6. Record, pp. 342-43. Upon the voir dire examination of Pickett, defense counsel originally objected to the admissibility of petitioner's statement on the ground of a "matter-of-law promise of immunity, coming from a Police Officer." p. 297.

confessions.[7] The trial judge refused to submit the issue of the voluntariness of defendant's admissions to the jury, confining its determination only to whether the statements actually had been made by petitioner and, if so, whether they were true.

The petitioner's conviction was affirmed without opinion by the Appellate Division.[8] The New York Court of Appeals, by a divided court, also affirmed the judgment of conviction.[9] The majority upheld the trial judge's refusal to submit to the jury the voluntariness of petitioner's incriminating statements. Its ruling appears to rest on a number of grounds: first, the voluntariness of petitioner's statements was not impugned by any misrepresentation by the Assistant District Attorney or by any other deception—that, in any event, deception alone would not have rendered the confession invalid; second, no promise of immunity was made by the Assistant District Attorney in accordance with the New York Penal Law; third, Pickett had not been authorized to make any promise of immunity; fourth, Pickett's statements to petitioner contained no promise of immunity, express or implied; fifth, Pickett's remark that he was interviewing petitioner as a prospective witness in the prosecution of Falco for murdering Munos was a fact, and to the exent that the statement "we are only going to use him as a witness" could be considered a promise, it was kept, since petitioner was never charged with participating in the killing of Munos.

The majority also held that Malloy v. Hogan [10] did not militate against its conclusion, since "[n]o whip was employed here, inasmuch as * * * [petitioner] was not led to believe that he would benefit or profit in any manner by making a statement." [11]

The minority differed from the majority as to the meaning to be attributed to Detective Pickett's statements, and also as to the admissibility of petitioner's confession. The minority was of the view that Pickett's "statements * * * were intended to mean and must have meant to defendant that he would not be prosecuted on any charge growing out of the homicide which was being investigated." [12] The minority concluded not only that the promise was broken, but also as a result the petitioner was convicted upon his own confession which was the product of testimonial compulsion, and that its use upon the trial was a deprivation of due process.

The fact that, as the majority found, the confession was admissible under the state statute (New York Code of Criminal Procedure, section 395) because no immunity had been granted or authorized as specified thereunder, and because it had not been "made under the influence of fear produced by threats," does not resolve the basic federal constitutional issues presented by petitioner. The state determination does not foreclose independent inquiry by this court.[13]

This court was of the view that the constitutional issues required amplification of the state record and accordingly

---

7. § 395 of the Code of Criminal Procedure provides:
   "A confession of a defendant * * * can be given in evidence against him, unless made under the influence of fear produced by threats, or unless made upon a stipulation of the district attorney, that he shall not be prosecuted therefor * * *."

8. People v. Caserino, 24 A.D.2d 555, 261 N.Y.S.2d 255 (1st Dep't 1965).

9. People v. Caserino, 16 N.Y.2d 255, 265 N.Y.S.2d 644, 212 N.E.2d 884 (1965) (Desmond and Fuld, JJ., dissenting).

10. 378 U.S. 1 (1964).

11. People v. Caserino, 16 N.Y.2d 255, 261, 265 N.Y.S.2d 644, 648, 212 N.E.2d 884, 887 (1965).

12. Id. at 262, 265 N.Y.S.2d at 649, 212 N.E.2d at 888.

13. Haynes v. State of Washington, 373 U.S. 503, 515, 83 S.Ct. 1336, 10 L.Ed. 2d 513 (1963); Fay v. Noia, 372 U.S. 391, 422, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963); Lisenba v. People of State of California, 314 U.S. 219, 236, 62 S.Ct. 280, 86 L.Ed. 166 (1941).

ordered an evidentiary hearing.[14] Petitioner, who had not testified upon the state trial, gave his version of events at the time of his questioning by Detective Pickett, and Detective Pickett gave testimony in addition to that received upon the trial, as did Assistant District Attorney Hammer.

Petitioner testified that immediately prior to his questioning by Pickett he had been under continued interrogation for eight hours by the New Jersey authorities in connection with other matters. He further testified that Pickett said he was speaking as a friend, since they came from the same neighborhood in New York City; that they needed his help and if he cooperated they would help him; that he told Pickett he was tired and refused to answer; that he was afraid, and was without a lawyer; that Pickett responded he did not have to be afraid, nor did he need a lawyer; that anything petitioner said would not be used against him; that they were not going to charge him with anything; that he was only to be used as a witness, and that except for Pickett's assurance he would not have made the statement he did. The substance of his testimony was not challenged.

Pickett, who impressed the court as a forthright witness, elaborated upon his state trial testimony. He testified he told petitioner: "We are in trouble and you are in trouble. There have been two shot and killed * * * in Lodi, New Jersey. * * * [I]f you will help us I think I can help you"; that Caserino responded he would tell what they wanted to know upon Pickett's promise of help.

Pickett thereupon left the room, conferred with his superiors and the Assistant District Attorney, then returned to the defendant and told him: "If you help us you can help yourself and we will only use you as a witness, and you will never go to trial in this case"; also in words or in substance that "what he would tell * * * would not, in any way, be used against him"; and finally, that no charges would be brought against him, and that these assurances were given because he felt he had been authorized to give them.[15]

Certain other facts round out the picture. Pickett, who knew of Warga's complaint against petitioner based upon the shooting at the bar and grill, already referred to, and also of the outstanding warrant for arrest thereunder, did not disclose either fact. He never informed petitioner that he was an accused upon any charge. The petitioner, sometime after he made the incriminating statement, was arrested under the warrant; the complaint, however, was dismissed upon his arraignment on the state's motion and immediately he was re-arrested upon the indictment warrant.

The fact pattern that emerges presents, in this Court's view, two separate although closely related constitutional issues: (1) whether the defendant's incriminating statement was obtained under a promise of immunity by state officials, in which event its use against him upon the trial violated his privilege against self-incrimination safeguarded against state action by the Fourteenth Amendment,[16] and (2) even if it be held

14. Townsend v. Sain, 372 U.S. 293, 310–318, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963).

15. As previously noted, there is conflict between Pickett and the Assistant District Attorney on this subject; supra note 2.

16. Malloy v. Hogan, 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964). Caserino was convicted on April 17, 1964 and sentenced on June 5, 1964 and *Malloy* was not decided until June 15, 1964. However, Caserino's appeals were both decided after *Malloy*, the New York Court of

Appeals decision appearing on November 24, 1965. The Supreme Court has not yet determined the extent to which *Malloy* will be given retroactive application, although it has with respect to others of the recent constitutional criminal cases: Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963); Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964); Linkletter v. Walker, 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965), which determined the retroactivity of Mapp v. State of Ohio, 367 U.S. 643 (1961);

that no promise of immunity was made, whether the circumstances under which the incriminating statement was obtained constituted such impermissible conduct on the part of state officials that its admission in evidence against petitioner upon his trial was unfair and deprived him of a fundamentally fair trial under the Due Process Clause of the Fourteenth Amendment.[17] On both issues the court concludes that the use of the confession against defendant at his trial was prohibited.[18]

## I

■■ The constitutional principle under our accusatorial system of justice that the prosecution must establish guilt by evidence independently and freely secured and may not by coercion prove its charge against the accused out of his own mouth,[19] also "reaches evidence of guilt

induced from a person under a governmental promise of immunity, and where that is the case such evidence must be excluded under the Self-Incrimination Clause of the Fifth Amendment." [20] The basic constitutional inquiry under the Fifth Amendment "is not whether the conduct of state officers in obtaining the confession was shocking, but whether the confession was 'free and voluntary; that is, [it] must not be * * * obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence. * * *'" [21] And as the Supreme Court has recently observed: "Evidence so procured can no more be regarded as the product of a free act of the accused than that obtained by official physical or psychological coercion." [22] Essential to determination of the issues is a consideration of the acts and statements of Pickett, their impact

Tehan v. U. S. ex rel. Shott, 382 U.S. 406, 86 S.Ct. 459, 15 L.Ed.2d 453 (1966), which determined the retroactivity of Griffin v. State of California, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965); Johnson v. State of New Jersey, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966), which determined the retroactivity of Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964), and Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Only if it were determined that *Malloy* fell within the prospective application rule of Johnson v. State of New Jersey, supra, would it not apply to this case. And since the Supreme Court expressly stated in *Malloy* that the application of the Fifth Amendment to the states would not greatly alter the current due process standards with respect to confessions, there seems to be no reason to limit *Malloy* to prospective application.

17. Prior to Malloy v. Hogan, 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964), the case would have presented only an issue of fundamental fairness under the Due Process Clause of the Fourteenth Amendment. See Twining v. State of New Jersey, 211 U.S. 78, 114, 29 S.Ct. 14, 53 L.Ed. 97 (1908); Lisenba v. People of State of California, 314 U.S. 219, 238, 62 S.Ct. 280, 86 L.Ed. 166 (1941). Insofar as

the issue in both the fundamental fairness and self-incrimination cases involves the "voluntariness" of the confession, the two lines of precedent and the two issues here overlap to some extent.

18. Of course, if the case were post-Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), other considerations would apply in determining the admissibility of the confession. But Miranda applies "only to cases in which the trial began after the date of our decision"—June 13, 1966. Johnson v. State of New Jersey, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966).

19. Miranda v. State of Arizona, 384 U.S. 436, 460, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1965); Malloy v. Hogan, 378 U.S. 1, 8, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964); Rogers v. Richmond, 365 U.S. 534, 541, 81 S.Ct. 735, 5 L.Ed.2d 760 (1961).

20. Shotwell Mfg. Co. v. United States, 371 U.S. 341, 347, 83 S.Ct. 448, 453, 9 L.Ed. 2d 357 (1963).

21. Malloy v. Hogan, 378 U.S. 1, 7, 84 S.Ct. 1489, 1493, 12 L.Ed.2d 653 (1964), quoting from Bram v. United States, 168 U.S. 532, 542–543, 18 S.Ct. 183, 42 L.Ed. 568 (1897).

22. Shotwell Mfg. Co. v. United States, 371 U.S. 341, 347–348, 83 S.Ct. 448, 453, 9 L.Ed.2d 357 (1963).

upon the petitioner and how he understood them.[23]

■ Upon the entire record, considered against the background of contemporaneous events, the totality of facts and an appraisal of the witnesses who appeared upon the evidentiary hearing before this court, the conclusion is compelled that Detective Pickett's statements to Caserino that the prosecution wanted and needed his help, that it "wanted his statement only as a witness," that "no charges would be brought against him," and that "you will never go to trial in this case" were reasonably understood by petitioner as an assurance that in exchange for his statement as to events attendant upon and incidental to the homicide and assault he would not be prosecuted for any crime arising therefrom. This finding as to the impact upon the petitioner of Pickett's statements is supported by evidence that Pickett intended his statements to have this all-inclusive meaning. Pickett testified that he felt he had the authority and consent of his superiors and the Assistant District Attorney to give such assurance to the petitioner. This evidence of Pickett's purpose gives weight to the defendant's testimony that he believed he would not be prosecuted upon any charge if he made a statement as to events at the bar and grill. And the fact that Pickett's assumed authority is questioned does not bear upon the issue of whether or not the defendant's statement was induced by "any direct or implied promise, however slight." And, again, while Pickett's purpose is not controlling, he acknowledged upon the state trial that he told petitioner his help was needed as "a good witness in the case of the killing of Munos" to induce him to make a statement with respect thereto.

■ The fact that a stipulation of immunity was not entered into in strict conformity with the New York state statute does not override constitutional requirements prohibiting the use of a confession given in exchange for a promise of immunity by a state official acting either with express or apparent authority.[24] If the statement is found to be a promise, the law is clear. Thus, the Supreme Court, in discussing the "position

23. Haynes v. Washington, 373 U.S. 503, 515, 83 S.Ct. 1336, 10 L.Ed.2d 513 (1963); Lynumn v. State of Illinois, 372 U.S. 528, 534, 83 S.Ct. 917, 9 L.Ed.2d 922 (1963); United States v. Middleton, 344 F.2d 78, 81 (2d Cir. 1965); United States ex rel. McGrath v. LaVallee, 319 F.2d 308 (2d Cir. 1963); Crawford v. United States, 219 F.2d 207, 210–211 (5th Cir. 1955); United States v. Tateo, 214 F. Supp. 560, 565 (S.D.N.Y.1963).

24. What is important is not whether the state official who obtains the confession is officially authorized to engage in the conduct by which the confession is obtained, but whether he appears to the accused at the time the confession is made to be a person in a position of authority. Thus, in Bram v. United States, 168 U.S. 532, 551, 18 S.Ct. 183, 190, 42 L.Ed. 568 (1897), the Supreme Court discussed the English rule that "the effect of inducements must be confined to those made by persons in authority," and proceeded to hold that: "[t]here can be no question, however, that a police officer, actually or constructively in charge of one in custody on a suspicion of having committed crime, is a person in authority within the rule; and, as this is so well established, we will not consider the adjudicated cases in order to demonstrate it * * *." And see also Bram v. United States, 168 U.S. at 563, 18 S.Ct. 183; Shotwell Mfg. Co. v. United States, 371 U.S. 341, 348, 83 S.Ct. 448, 454, 9 L.Ed.2d 357 (1963) (discussing a promise of immunity or leniency made by a "policeman, a prosecutor, or an investigating agency * * *."). Again, in Lynumn v. State of Illinois, 372 U.S. 528, 534, 83 S.Ct. 917, 9 L.Ed.2d 922, the Supreme Court made clear that it does not matter whether the interrogating officer possessed the power to carry out a threat, so long as the confessor reasonably believed he had that power. What the court said in *Lynumn* with regard to threats applies equally to promises. See also, Leyra v. Denno, 347 U.S. 556, 74 S.Ct. 716, 98 L.Ed. 948 (1954), where the conduct eliciting the confession was not police conduct but that of a psychiatrist acting as an agent of the police; Crawford v. United States, 219 F.2d 207 (5th Cir. 1955); State v. Ely, 237 Or. 329, 390 P.2d 348 (1964).

* * * of a person, accused or suspected of crime, to whom a policeman, a prosecutor, or an investigating agency has made a promise of immunity or leniency in return for a statement," has stated that "[i]n those circumstances an inculpatory statement would be the product of inducement, and thus not an act of free will." [25]

The prosecution presses here, as it did in the state courts, that Pickett's statement was not a promise but only a statement of fact—that in truth Caserino was a material witness to the homicide, and further, assuming arguendo that it was a promise, it was only to refrain from Caserino's prosecution for the homicide—a promise, the state argues, that was kept since he was not prosecuted for homicide, but for possession of a weapon and being an accessory to a felony.

This argument is based upon Detective Pickett's statement to petitioner that "[w]e know you could not be charged with the homicide." The argument proves too much. If petitioner could not be charged with the homicide, then Pickett's statement that "no charges would be brought against him" could only have referred to other crimes related to events at the time of the homicide. In addition, the state's argument completely ignores the context and broad sweep of all the detective's assurances to petitioner. To accept the state's finespun distinction as to the restricted meaning of the detective's statement is to fly in the face of reality. To accept it is to attribute to this defendant, or for that matter to any other layman of his age, experience and predicament at the time of questioning, the acuteness of an old common-law pleader, familiar with the "nice sharp quillets of the law," [26] with knowledge of the subtle distinctions among various crimes—with understanding of the differences between homicide and accessory crimes. The inducing character of Pickett's assurances to petitioner, whether they be called a promise of immunity or leniency, whether made under express or assumed authority, cannot be gainsaid. The defendant's incriminating statement was secured in an atomsphere of inducement created by the detective's promise. Its subsequent use against petitioner upon his trial in the circumstances here presented violated his privilege against self-incrimination.[27] It should have been barred from evidence.

## II

But over and beyond this, the inculpatory statement should have been excluded as unfairly obtained. Pickett's assurances to petitioner that he was wanted only as a witness cannot be considered in a vacuum. When petitioner was interviewed, he had already been under constant interrogation by New Jersey authorities for eight hours through the early hours of the morning; he was tired and afraid.[28] Petitioner, entreated to help the state, his fears allayed by claims of friendship, agreed to talk when he was assured he would not be prosecuted on any charge. Coupled with Pickett's assurances was deception [29] by concealment

**25.** Shotwell Mfg. Co. v. United States, 371 U.S. 341, 348, 83 S.Ct. 448, 454, 9 L.Ed.2d 357 (1963). See also, Bram v. United States, 168 U.S. 532, 542–543, 18 S.Ct. 183, 42 L.Ed. 568 (1897); Crawford v. United States, 219 F.2d 207 (5th Cir. 1955).

**26.** Shakespeare, King Henry VI, Part I, Act 2, Scene 4, Line 12 (University Society Inc. Ed. 1901).

**27.** Malloy v. Hogan, 378 U.S. 1, 6–8, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964); Shotwell Mfg. Co. v. United States, 371 U.S. 341, 347–350, 83 S.Ct. 448, 9 L.Ed.2d 357 (1963); Bram v. United States, 168

U.S. 532, 542–543, 18 S.Ct. 183, 42 L.Ed. 568 (1897).

**28.** Cf. Rogers v. Richmond, 365 U.S. 534, 535–536, 81 S.Ct. 735, 5 L.Ed.2d 760 (1961) (seven hours continuous interrogation); Spano v. People of State of New York, 360 U.S. 315, 322, 79 S.Ct. 1202, 3 L.Ed.2d 1265 (1959) (eight hours continuous interrogation).

**29.** While perhaps deception alone may not render a subsequent confession inadmissible under the Fourteenth Amendment, it is an important factor in the due process inquiry. Spano v. People of State of New York, 360 U.S. 315, 323, 79 S.Ct.

of material matters.[30] Concealed from the petitioner was the fact that a warrant for his arrest was then outstanding upon Warga's complaint that petitioner had acted in concert with Falco in the assault and that the warrant was then in possession of a brother officer and available for immediate execution. And added to Pickett's statements and concealment that petitioner already was accused of a crime arising out of the shooting were still other factors: the failure to advise petitioner of his right to counsel and, if defendant's version be accepted, affirmatively advising him that he did not need counsel; the failure to inform him of his right to remain silent and that his statement could be used against him. These latter factors bear significantly on whether the statement procured from the petitioner meets the required standard of voluntariness.[31]

Thus, Pickett's statements do not stand in isolation. Considered together with all the attendant circumstances, the defendant's incriminating statement cannot be said to have been "the voluntary product of a free and unconstrained will, as required by the Fourteenth Amendment,"[32] and its use upon the trial against the defendant was in derogation of his right to a fundamentally fair trial under the due process clause of that Amendment.

A case in which our Court of Appeals condemned conduct as violative of due process and which bears a marked similarity to the instant case is United States ex rel. Everett v. Murphy.[33] There, too, the petitioner was not warned of his right to remain silent or to counsel. His confession also was obtained by deception and a false promise of help; he was deceived into believing that the victim of his assault had not died, and promised assistance on the resulting less serious charge. There, as here, the deception "was used to make more plausible the promise of assistance to induce confession."[34] The combination of circumstances was held violative of defendant's right to due process, and the confessions were barred. The police conduct here is just as offensive to due process and the confession equally inadmissible.

The judgment of conviction is vacated and the writ of habeas corpus is sustained. Unless the case is moved for trial within thirty (30) days from date, the petitioner is discharged from custody.

The foregoing shall constitute the Court's Findings of Fact and Conclusions of Law.

1202, 3 L.Ed.2d 1265 (1959); United States ex rel. Everett v. Murphy, 329 F. 2d 68, 70 (2d Cir.), cert. denied, 377 U.S. 967, 84 S.Ct. 1648, 12 L.Ed.2d 737 (1964). See also, Brock v. United States, 223 F.2d 681, 684 (5th Cir. 1955).

30. As already noted, Pickett intended fulfillment of his promise of immunity in return for petitioner's statement, and so he may not have deemed the criminal charge and the warrant thereunder of importance. In the circumstances he cannot be taxed with purposeful and deliberate misrepresentation because the state failed to keep the promise. Nonetheless, it was concealment as far as petitioner was concerned.

31. Johnson v. State of New Jersey, 384 U.S. 719, 731, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966); Davis v. State of North Carolina, 384 U.S. 737, 740–741, 86 S.Ct. 1761, 16 L.Ed.2d 895 (1966); Haynes v. People of State of Washington, 373 U.S. 503, 510–511, 516–517, 83 S.Ct. 1336, 10 L.Ed.2d 513 (1963).

32. Haynes v. State of Washington, 373 U.S. 503, 514, 83 S.Ct. 1336, 1343, 10 L.Ed.2d 513 (1963). Cf. Davis v. State of North Carolina, 384 U.S. 737, 752, 86 S.Ct. 1761, 16 L.Ed.2d 895 (1966).

33. 329 F.2d 68 (2d Cir.), cert. denied, 377 U.S. 967, 84 S.Ct. 1648, 12 L.Ed.2d 737 (1964).

34. Id. 329 F.2d at 70.